[No. H021322. Sixth Dist. May 5, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER EVANS HUBBART, Defendant and Appellant.

1204

**COUNSEL**

Jonathan Grossman, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Ross Moody, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—Defendant Christopher Evans Hubbart appeals after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.). The trial court ordered him committed to Atascadero State Hospital (ASH) for a two-year period.

On appeal, defendant contends: (1) the SVPA violates the state and federal constitutional guarantees of equal protection; (2) the SVPA violates the federal constitutional prohibitions against ex post facto laws and double jeopardy, and it violates the federal constitutional guarantee of due process; (3) defendant's commitment is invalid because he was not in legal custody at the time the petition for commitment was filed; (4) the trial court erred by instructing the jury on the standard of proof pursuant to CALJIC No. 4.19; (5) the trial court erred by admitting detailed evidence of 16 of defendant's sexual assaults; (6) the cumulative impact of the trial errors warrants reversal.

We will affirm the judgment.

### I. BACKGROUND

We have previously summarized the SVPA in several cases, most recently in *Butler v. Superior Court* (2000) 78 Cal.App.4th 1171, 1174-1177 [93 Cal.Rptr.2d 468]. (See also *People v. Superior Court (Howard)* (1999) 70 Cal.App.4th 136, 148-151 [82 Cal.Rptr.2d 481]; *People v. Butler* (1998) 68 Cal.App.4th 421, 424-428 [80 Cal.Rptr.2d 357].) The California Supreme Court summarized the SVPA and some of the procedural history of this case in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143-1149 [81 Cal.Rptr.2d 492, 969 P.2d 584].

On January 2, 1996, the District Attorney of Santa Clara County filed a petition to commit defendant as an SVP. The petition alleged that defendant was in the custody of the Department of Corrections, with a scheduled release date of January 25, 1996. Attached to the petition was a declaration by a deputy district attorney. The declaration alleged that defendant qualified for commitment under the SVPA because he had been convicted of sexually

violent offenses against at least two victims and because two psychologists had diagnosed defendant as having a mental disorder such that he was likely to engage in acts of sexual violence without appropriate treatment and custody. The psychiatric evaluations were attached to the petition.

Defendant filed a demurrer to the petition on January 19, 1996, alleging that the SVPA was unconstitutional on its face and as applied to him. The trial court overruled the demurrer on February 9, 1996. Defendant then petitioned this court for a writ of mandate and a stay of the proceedings. After we denied writ relief, defendant petitioned for review in the California Supreme Court, which affirmed our decision, in *Hubbart v. Superior Court, supra*, 19 Cal.4th 1138.

The California Supreme Court rejected defendant's several due process challenges to the SVPA. First, the court held that the definition of "diagnosed mental disorder" was not overbroad for lack of an express "mental illness" requirement. (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1157.) Second, the court held that the definition of dangerousness was not overbroad, concluding that the SVPA "requires the trier of fact to find that an SVP is dangerous at the time of commitment" (*id.* at p. 1162) and precludes commitment based solely on evidence of prior sexually violent offenses (*id.* at pp. 1163-1164). Third, the court held that the SVPA does not need to guarantee effective treatment in order to comply with due process (*id.* at p. 1164), and it rejected defendant's "suggestion that the Act's treatment provisions are a sham" (*id.* at p. 1166).

The California Supreme Court also rejected an equal protection challenge to the SVPA. It held that because the SVPA requires a finding of present dangerousness, it "does not permit the involuntary commitment of mentally disordered persons based on a definition of dangerousness materially distinct" from the definition used under analogous statutory schemes. (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1169.)

Finally, the California Supreme Court held that the SVPA did not offend the ex post facto clauses of the state and federal Constitutions, finding that defendant failed to demonstrate "that the SVPA imposes punishment or otherwise implicates ex post facto concerns." (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1179.)

Defendant's jury trial ultimately commenced on February 7, 2000. He stipulated that he had been convicted of a qualifying sex offense against two or more victims. (Welf. & Inst. Code, § 6600, subd. (a).) Specifically, he had three 1973 convictions of forcible sodomy (Pen. Code, § 286), a 1973

conviction of forcible rape (former Pen. Code, § 261, subd. 3; see Stats. 1970, ch. 1301, § 1, p. 2405),[1] a 1982 conviction of forcible rape (former Pen. Code, § 261, subd. 2; see Stats. 1970, ch. 1301, § 1, p. 2405), and a 1982 conviction of forcible oral copulation (Pen. Code, § 288a, subd. (a)).

Defendant testified for the People and on his own behalf. He began breaking into houses to watch women when he was about 15 or 16 years old. He first sexually assaulted a woman when he was a senior in high school; he reached out and touched her breast as she was walking by. He repeated that type of assault seven or eight times before 1971, and about eight to ten times after he started college in 1971. He would sometimes follow women home.

Defendant began to sexually assault women in their homes in 1972. He committed 25 or 26 such assaults that year, all of them in the Los Angeles area. He would drive around in the early morning and look for homes that had garage doors open, indicating the man of the house had gone to work. He would also look for children's toys, believing that mothers would be protective of their children and more likely to cooperate with him. He would bind the women's hands and cover their faces, then sexually assault them. The sexual acts included fondling their breasts, vaginal intercourse, and anal intercourse.

In November of 1972, defendant was arrested and indicted, then deemed a mentally disordered sex offender (MDSO). (Former Welf. & Inst. Code, § 6300 et seq.) He spent about six and a half years in treatment at ASH. In November of 1979, defendant was released from ASH. He went to live in the south Bay Area, where he continued to receive treatment from Dr. Gary Freitas, a therapist he had met at ASH.

Within a few months of his release, defendant committed another string of sexual assaults and burglaries. He committed about 50 burglaries in Sunnyvale and San Francisco, beginning in February of 1980. He committed two rapes in San Francisco, in December of 1980 and January of 1981, and then committed a string of sexual assaults in the Sunnyvale area. Called by the prosecution, defendant provided the details of these incidents at his SVPA trial.

In December of 1980, defendant saw a woman inside her home in San Francisco. He came back about 3:00 or 4:00 a.m., with a flashlight and

---

[1]Former Penal Code section 261, subdivision 3 included both forcible rape and rape accomplished because the victim was under the influence of a controlled substance. Defendant concedes, however, that the evidence indicates he committed forcible rape. (See *People v. Butler, supra*, 68 Cal.App.4th at pp. 436-438.)

material for binding and gagging the victim. He entered through an open window in the back of the house. He woke the victim by putting his hand over her mouth. He told her, "just do what I say and it will be all right." He tied her hands behind her back, gagged her, and covered her eyes. He fondled her breasts, inserted his finger into her vagina, and then attempted to sodomize her. He did not penetrate her anus because the victim told him no. Instead, he inserted his penis into her vagina. He unbound the victim before leaving.

In January of 1981, defendant saw a woman enter her San Francisco apartment. He found her physically attractive. He returned a few days later. He climbed an outside railing, opened a window, and entered the victim's apartment. He woke the victim by placing his hand over her mouth and told her to comply with him. He bound her hands, gagged her, and covered her eyes. He then fondled her breasts. He attempted to rape her, but she claimed she had a venereal disease, so instead he sodomized her.

On January 19, 1981, defendant entered an apartment at the Daisy Ridge apartment complex in Sunnyvale, about 3:45 a.m. He woke the victim up and attempted to keep her quiet. He did not bind her in any way and he did not commit any sexual assault. On January 29, 1981, about 5:15 a.m., defendant entered the same apartment, because he "had some thoughts about going back and probably fondling" the woman, whom he found attractive. He encountered a second woman. He threatened to slit her throat if she screamed, then fondled her breasts.

On February 19, 1981, defendant entered another Sunnyvale residence about 4:30 a.m. He intended only to take money, but he noticed the victim and decided to "do more." He left to obtain some materials. When he returned, he placed his hand over the victim's mouth, bound her hands behind her back, gagged her, and placed tape over her eyes. He fondled the victim's breasts and inserted a vibrator into her vagina. He also had the victim rub his penis.

On March 24, 1981, defendant entered an apartment at the Daisy Ridge apartment complex about 4:00 a.m. He covered the victim's mouth, fondled her breasts, and left. A week later, he returned to the same apartment complex and entered a different apartment, at 4:30 a.m. He saw the victim, who was attractive to him, and left to obtain some materials. When he returned, he woke the victim, taped her hands behind her back, taped her mouth shut, and wound an elastic bandage around her head. He placed petroleum jelly on his fingers and the victim's anus, then inserted his finger into her anus. He also fondled her breasts and put his finger into her vagina.

On April 8, 1981, defendant again was prowling around the Daisy Ridge apartment complex. However, he was chased by the police and did not enter any apartment. Sometime after 4:00 a.m. that same day, defendant went to another apartment complex. He took the screen off of a window and put his hand inside. When he heard a woman scream, he left.

On April 18, 1981, defendant entered another Sunnyvale apartment about 4:30 a.m. The victim was between 18 and 20 years old, which made him "uncomfortable," since he usually chose victims who were in their late 20's to early 30's. He woke the victim, placed his hand over her mouth, covered her eyes, and bound her hands. He fondled her breasts and inserted a finger into her vagina.

On May 5, 1981, defendant entered an apartment on North Mathilda about 4:00 a.m. After he saw the victim, he left and returned to sexually assault her. He woke her up in the same manner as with the other victims, bound her, gagged her, and covered her head. He fondled her breasts, and put petroleum jelly on his fingers, her vagina, and her anus. He inserted his fingers into both her vagina and her anus, and also forced her to orally copulate him.

On May 19, 1981, defendant was once again chased by the police as he prowled around the Daisy Ridge apartment complex at 4:30 a.m. On May 23, 1981, defendant was prowling around on the roof of an apartment complex on Fair Oaks. After he dropped onto a balcony, he was chased off by the residents. On May 26, 1981, he returned to the apartment he had attempted to enter on April 8, 1981. Again, he ran when the victim screamed.

On June 5, 1981, defendant returned to the apartment complex on Fair Oaks about 3:30 a.m. He woke the victim and covered her mouth, then bound her, gagged her, and wrapped her head. He fondled her breasts.

On June 28, 1981, defendant returned to the apartment complex on North Mathilda about 4:40 a.m. After seeing the victim inside an apartment, he left to obtain materials with which to bind her. When he returned, he woke the victim by covering her mouth, and threatened her. He taped her hands and mouth, then went into the bathroom to prepare an enema. He placed petroleum jelly on his fingers, then inserted them into the victim's anus and vagina. He also fondled her breasts. He administered the enema, then sodomized her. On July 20, 1981, defendant again returned to the North Mathilda apartment complex in the middle of the night. He was chased away by the police.

On August 20, 1981, defendant went to a residence on Beamer, where he had seen the victim a few weeks earlier. He entered the residence about 4:00 a.m., woke the victim and told her not to scream. He bound her, gagged her, and wrapped her head with an elastic bandage. He put a lubricant on his fingers and inserted them into her vagina and her anus. He also inserted a vibrator into her anus, attempted to sodomize her, and raped her.

On September 24, 1981, defendant saw a woman leave a Cupertino apartment complex near his school. He found her attractive and returned in the middle of the night. The victim was not home, so he waited for her inside. When she returned, he came up behind her, covered her mouth, and told her to be quiet. He taped her hands and mouth and covered her eyes. When she cried, defendant told her "shut up or I'll kill you." He fondled her breasts, inserted a vibrator into her anus, and sodomized her.

On September 29, 1981, defendant entered an apartment on East McKinley. He had seen the victim enter that apartment previously and was attracted to her. He woke her by placing his hand over her mouth, bound and gagged her, inserted his fingers into her anus and vagina, and forced her to orally copulate him.

On October 19, 1981, defendant entered another victim's residence about 4:00 a.m. He had seen the victim previously and found her attractive. He woke her up and told her, "Don't scream or I'll blow your head off." He put his hand over her mouth, then bound and gagged her with leather straps. He fondled her breasts, inserted his fingers into her vagina and anus, and administered an enema. He forced her to orally copulate him, then masturbated.

Defendant was arrested. He was readmitted to ASH in November of 1981. In March of 1982, he was released from ASH and returned to court. He was convicted of forcible oral copulation, forcible rape, false imprisonment (six counts), and burglary (eight counts). He was sentenced to prison for 16 years.

Defendant was released on parole on April 12, 1990. He soon reoffended. On June 19, 1990, he was attracted to a woman he saw on a bus. He followed her off the bus, intending to touch her breasts and then run off. However, before he got to her, he tripped and fell. The next day, June 20, 1990, defendant saw a woman jogging. He was attracted to her and he followed her. He attacked her from behind, placing his hand over her mouth. He grabbed her breast, then let her go when she screamed.

Defendant's parole was revoked and he was returned to prison at the end of June 1990. He was released from prison in 1993. About a month and a

half after his release, his parole was revoked for psychiatric treatment, pursuant to title 15, California Code of Regulations, section 2616, former subdivision (a)(7). The SVPA petition was filed while he was in prison pursuant to that parole revocation, on January 2, 1996.

Dr. Amy Phenix, a clinical psychologist for the state Department of Mental Health (DMH), evaluated defendant in December of 1995 and in March of 1999. As part of the latter evaluation, she interviewed defendant and reviewed all of his records. At that time, defendant expressed concern that he was having "fantasies that involve a little aggression."

Dr. Phenix diagnosed defendant as having paraphilia with nonconsenting adults, a diagnosed mental disorder. Someone with paraphilia would generally exhibit, over a period of at least six months, "recurrent, intense, sexually arousing fantasies, urges or behaviors that cause some type of sexually deviant acts." Dr. Phenix also diagnosed defendant as having klismaphilia, a disorder characterized by a person becoming sexually aroused from administering forced enemas.

Dr. Phenix explained that defendant's "pattern of offending and the rate of his offending" caused her to opine that his mental disorders severely affected his volition. She believed that defendant continued to experience the fantasies and urges that led to his past sexually deviant behavior, based on the severity of his paraphilia and the fact that there had been "no meaningful intervention." She conducted a risk assessment that indicated defendant was likely to reoffend.

Dr. Phenix used the Static-99 actuarial instrument as part of her risk assessment. That instrument calculated defendant's risk of reoffense based on the number of his sex offenses, sentencing dates, convictions for non-contact sex offenses, and convictions for non-sex offenses. It also took into account the fact that defendant's victims were unrelated to him, his age at time of evaluation, and the fact that defendant had not lived with a partner for two years or more. Defendant's total score was "a six plus," putting him in "the high risk category." The results indicated that defendant had a 52 percent risk of reoffending within 15 years.

Dr. Phenix listed additional risk factors derived from research but not included in the Static-99 test. The additional risk factors applicable to defendant included his severely deviant sexual preferences, his failure to respond to treatment, his early onset of sexual offending, the diversity of his sex crimes, his negative relationships with his parents, his lack of compliance with supervision, his self-placement into high-risk situations, his failure

to develop and maintain an intimate relationship with an appropriate partner over time, and his denial of risk of reoffending. Dr. Phenix opined that these additional factors would "increase significantly the prediction of the Static-99."

Dr. Craig Nelson, the clinical administrator at ASH, evaluated defendant in December of 1995 and again in August of 1999. He reviewed all of defendant's records and interviewed him. Dr. Nelson diagnosed defendant with paraphilia, not otherwise specified. His diagnosis was based on defendant's mental status, behavioral history, family history, education, work history, substance abuse history, criminal history, and his institutional adjustments while in ASH and in prison. Defendant had told him that, as a teenager, he would fantasize about breaking into houses and forcing women to have sex with him. The fact that defendant acted out this fantasy numerous times supported Dr. Nelson's diagnosis and demonstrated the severity of defendant's paraphilia.

Dr. Nelson described some of the factors supporting his opinion that defendant presented a high risk of reoffending. Defendant had consensual sex partners at the same time as he was committing sexual assaults in 1980 and 1981, which indicated that he preferred forcible sex. Defendant was in treatment during those two years, which indicated that treatment was unsuccessful. Defendant's 1990 assault was spontaneous rather than planned, which meant there was less likelihood that intervention would prevent reoffense. Defendant committed the 1990 assault only 68 days after his release. Defendant had never been married or cohabited with another adult. Defendant's sexual offending began at a fairly early age. Defendant had intimacy deficits. Defendant had difficulty controlling his behavior and had no plan for dealing with his stress or deviant sexual urges.

Dr. James Missett, a psychiatrist, testified for the defense. In September of 1999, he interviewed defendant and reviewed defendant's records. He opined that defendant did not currently have a diagnosed mental disorder. Rather, defendant had paraphilia in remission, since he had not pursued any sexually deviant interests or fantasies in 10 years. He explained that while defendant had exhibited symptoms of paraphilia in 1990, the circumstances of the 1990 offenses indicated that defendant was in better control than he had been previously. Defendant's mental health records indicated he was more aware of his sexually deviant feelings in the 1990's than he had been during earlier periods of treatment.

Dr. Misset admitted that there was a risk that defendant would reoffend. He noted, however, that defendant was 49 years old at the time of trial and

therefore would likely experience a decrease in his sex drive. Dr. Misset stated that in light of defendant's awareness of his problem, defendant was "less likely to reoffend than somebody else."

Dr. Theodore Donaldson, a clinical psychologist, also testified for the defense. In March of 1999, he interviewed defendant and reviewed defendant's records. He did not believe that defendant had a current diagnosed mental disorder. Defendant had suffered from paraphilia when he committed his sex offenses in the 1970's and 1980's, since defendant was unable to control his behavior at those times and those assaults were preceded by fantasies. However, by 1990, defendant's paraphilia was in remission. Dr. Donaldson described defendant's 1990 offenses as "a momentary lapse." He noted that the 1990 offenses were not preceded by fantasies, and that defendant was able to retain his control. He also noted that defendant did not commit any sexual assaults upon his release from prison in 1993.

Dr. Donaldson opined that defendant was not likely to reoffend. He calculated defendant's risk of reoffense using the California Actuarial Risk Assessment Tables (CARAT), an unofficial method. The CARAT method indicated defendant had a 10.2 percent chance of committing a hands-on sex offense during the next five years.

On March 21, 2000, the jury found the allegations in the SVPA petition true. The trial court ordered defendant committed to ASH for a two-year period, beginning on the date of the jury's verdict. This appeal followed.

## II. DISCUSSION

### A. *Equal Protection*

Defendant raises four equal protection claims not addressed in *Hubbart v. Superior Court, supra,* 19 Cal.4th 1138. Defendant raised the first three equal protection arguments in a supplemental brief filed in the California Supreme Court, but the court declined to address those claims because they were not "timely raised or properly presented." (*Id.* at p. 1170, fn. 31.)

■ The right to equal protection of the laws is guaranteed by the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. The "first prerequisite" to an equal protection claim is " 'a showing that "the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." ' . . ." (*People v. Massie* (1998) 19 Cal.4th 550, 571 [79 Cal.Rptr.2d 816, 967 P.2d 29], citations omitted.)

"Equal protection applies to ensure that persons similarly situated with respect to the legitimate purpose of the law receive like treatment; equal protection does not require identical treatment. [Citation.]" (*People v. Green* (2000) 79 Cal.App.4th 921, 924 [94 Cal.Rptr.2d 355].) The state "may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of power." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 172 [167 Cal.Rptr. 854, 616 P.2d 836].)

"Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment. [Citations.]" (*People v. Green, supra,* 79 Cal.App.4th at p. 924.) Under the strict scrutiny standard, " ' "*the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." [Citation.]' [Citation.]" (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641 [88 Cal.Rptr.2d 283, 982 P.2d 154], fn. omitted, original italics.)

Defendant claims he is similarly situated to persons committed under other civil commitment schemes, such as the mentally disordered offender (MDO) commitment scheme (Pen. Code, § 2960 et seq.), the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.), and the commitment scheme for persons found not guilty by reason of insanity (NGI) (Pen. Code, § 1026 et seq.). He contends the SVPA fails to provide equal treatment when compared to these other civil commitment schemes.

### 1. *Definition of Mental Disorder*

Defendant contends the SVPA violates equal protection because its definition of mental disorder is less exacting than the definition of mental disorder contained in the MDO law. We begin with the assumption that, for this purpose, persons committed under the SVPA are similarly situated to persons committed under the MDO law. (Cf. *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1158 [88 Cal.Rptr.2d 696]; *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1436 [252 Cal.Rptr. 56] ["an MDO is similarly situated for purposes of the law to other adult persons involuntarily committed for mental health treatment"], abrogated on other grounds as stated in *People v. Robinson* (1998) 63 Cal.App.4th 348, 352 [74 Cal.Rptr.2d 52].)

In order to be committed under the SVPA, a person must have "a diagnosed mental disorder that makes the person a danger to the health and

safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a).) A "diagnosed mental disorder" is defined as including "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (Welf. & Inst. Code, § 6600, subd. (c).)

In order to be committed under the MDO law, a person must have "a severe mental disorder that is not in remission or cannot be kept in remission without treatment." (Pen. Code, § 2962, subd. (a).) A "severe mental disorder" is defined as "an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or which grossly impairs behavior, or that demonstrates evidence of an acute brain syndrome for which prompt remission, in absence of treatment, is unlikely." (*Ibid.*) The MDO law specifies that the term "severe mental disorder" "does not include a personality or adjustment disorder, epilepsy, mental retardation or other developmental disabilities, or addiction to or abuse of intoxicating substances." (*Ibid.*)

Defendant's equal protection argument rests on the fact that personality and adjustment disorders are excluded from the MDO law but not from the SVPA. However, the terms used to describe the degree of mental disorder required for civil commitment carry no "talismanic significance." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 359 [117 S.Ct. 2072, 2080, 138 L.Ed.2d 501] (*Hendricks*); see also *Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1157.) What is important is that the civil commitment scheme in question requires proof of both a mental disorder and proof of dangerousness, so that confinement is limited "to those who suffer from a volitional impairment rendering them dangerous beyond their control." (*Hendricks, supra,* 521 U.S. at p. 358 [117 S.Ct. at p. 2080]; see also *People v. Butler, supra,* 68 Cal.App.4th at pp. 441-442.)

As noted above, the SVPA requires the committed person have "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a).) The MDO law similarly requires the committed person have a "severe mental disorder" and that because of the disorder, the person presents a "substantial danger of physical harm to others." (Pen. Code, § 2962, subds. (a) & (d)(1); see *People v. Clark* (2000) 82 Cal.App.4th 1072, 1075-1076 [98 Cal.Rptr.2d 767].) Thus, both the SVPA and the MDO law require that the person suffer from a mental disorder rendering them dangerous beyond their control.

While phrased differently, the two schemes set forth similar standards for the mental disorder necessary for commitment. The two schemes do not treat the committed person differently for purposes of defining the requisite mental disorder. We conclude the SVPA does not violate equal protection in this respect. (See *People v. Buffington, supra*, 74 Cal.App.4th at p. 1158; *People v. Poe* (1999) 74 Cal.App.4th 826, 833 [88 Cal.Rptr.2d 437].)

### 2. *Evidence Necessary for Commitment*

■ Defendant contends the SVPA violates equal protection because it has a lower evidentiary standard than the MDO law, the LPS Act, or the NGI scheme. Again, we will base our analysis on the assumption that, for this purpose, persons committed under the SVPA are similarly situated to persons committed under the other three civil commitment schemes. (See *People v. Buffington, supra*, 74 Cal.App.4th at p. 1159.)

Defendant claims that the SVPA violates equal protection because it does not require "current psychological symptoms, any overt acts suggesting a current mental disorder, or an objective basis for a finding an inmate is likely to re-offend."

In *Butler v. Superior Court, supra*, 78 Cal.App.4th at page 1180, we explained that each commitment under the SVPA must be based on the defendant's "*current* mental condition." (Italics added.) " 'The nature of the [SVPA] envisions a special civil commitment proceeding that is begun and then continues, changes or ends depending upon the *current* mental condition and dangerousness of the proposed or committed SVP . . . .' " (*Ibid.*, quoting *People v. Hedge* (1999) 72 Cal.App.4th 1466, 1476 [86 Cal.Rptr.2d 52].)

In order to be committed under the SVPA, a person must be in custody in state prison. Six months prior to the person's scheduled release date, the person is screened for eligibility. (Welf. & Inst. Code, § 6601, subds. (a) & (b).) Next, the person is evaluated by two practicing psychiatrists or psychologists, "in accordance with a standardized assessment protocol," for a determination whether the person "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody." (Welf. & Inst. Code, § 6601, subds. (c) & (d).) A petition for commitment may be filed only upon the concurrence of two evaluators. (Welf. & Inst. Code, § 6601, subd. (d).) While there is no need for proof of a recent overt act while the offender is in custody (Welf. & Inst. Code, § 6600, subd. (d)), it is clear that the SVPA permits civil commitment only upon a finding that the person has *current* psychological symptoms that render him or her likely to reoffend.

The SVPA's requirement of a current mental condition and current dangerousness is similar to the requirements of the other civil commitment schemes. Contrary to defendant's assertion, the other civil commitment schemes do not require proof of a recent overt act.

The MDO law, like the SVPA, provides for the commitment of persons upon their completion of a term in state prison. The MDO law requires that prior to release on parole, the committed person be evaluated to determine whether he or she has a "severe mental disorder that is not in remission or cannot be kept in remission without treatment." (Pen. Code, § 2962, subd. (a).) The MDO law specifies that a person "cannot be kept in remission without treatment" if, although in remission, "he or she has been physically violent . . . or he or she has made a serious threat of substantial physical harm . . . , or he or she has intentionally caused property damage, or he or she had not voluntarily followed the treatment plan." (*Ibid.*) The MDO law further specifies that the phrase " 'substantial danger of physical harm' does not require proof of a recent overt act." (Pen. Code, § 2962, subd. (f).)

The LPS Act provides for long-term commitment of a person who has a mental disorder or mental defect, if the person has attempted, inflicted, or made a serious threat of substantial physical harm upon the person of another. The person must have committed the act or threat after being taken into custody; or else the act or threat must have resulted, at least in part, in the person's being taken into custody. (Welf. & Inst. Code, § 5300, subds. (a)-(c).) Under the LPS Act, proof of "a recent overt act of violence is unnecessary where . . . the initial confinement resulted from the commission of such an act." (*People v. Martin* (1980) 107 Cal.App.3d 714, 726 [165 Cal.Rptr. 773].)

The NGI scheme requires a finding that the person committed a criminal offense, and that he or she was "insane at the time the offense was committed." (Pen. Code, § 1026, subd. (a); see also Pen. Code, § 25, subd. (b).) Upon a finding of insanity at the time the offense was committed, the person is committed to a state hospital, unless it appears that the person's sanity has been fully recovered. (Pen. Code, § 1026, subd. (b).) The maximum term of commitment is equivalent to "the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted . . . ." (Pen. Code, § 1026.5, subd. (a)(1).) However, the person's commitment may be extended beyond the maximum term if he or she "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (Pen. Code, § 1026.5, subd. (b)(1).) Thus, like the SVPA, the NGI scheme does permit an extended civil commitment upon a finding of a current mental disorder rendering the person dangerous to others, and without any recent overt act.

In summary, the SVPA requires proof of a current mental condition and current dangerousness but not a recent overt act. It is similar to the other civil commitment schemes in this regard. We conclude that the SVPA's evidentiary standard does not result in an equal protection violation.

### 3. *Treatment*

■ Defendant contends the SVPA violates equal protection by failing to provide for treatment prior to the commencement of long-term commitment, in contrast to the MDO law and LPS Act. We find no equal protection violation in this respect because persons committed under the SVPA are not similarly situated to persons committed under the MDO law or LPS Act for this purpose. (See *People v. Buffington, supra,* 74 Cal.App.4th at pp. 1162-1163.)

The SVPA provides for treatment upon the commencement of an SVP's term of commitment (Welf. & Inst. Code, § 6606), which generally will not begin until after the person has completed his or her prison term. (See Welf. & Inst. Code, § 6601.3 [person may be kept in custody 45 days beyond scheduled release date for full evaluation]; Welf. & Inst. Code, § 6602 [upon finding of probable cause, judge "shall order that the person remain in custody" pending trial].)

Under the SVPA, it is not necessary for the prison term to be related to one of the person's qualifying sexually violent offenses. (Welf. & Inst. Code, § 6600, subd. (a).) In contrast, a commitment under the MDO law is contingent upon the fact that the person is serving a prison term for the qualifying offense or offenses. (Pen. Code, § 2960 [severe mental disorder must have been "one of the causes of" or "an aggravating factor in the commission of the crime for which" the person was incarcerated].) The MDO law requires the person be evaluated for severe mental disorders during the first year of his or her prison term, and it specifies that "severely mentally disordered prisoners should be provided with an appropriate level of mental health treatment while in prison . . . ." (Pen. Code, § 2960.) A person may be committed under the MDO law only if he or she "has been in treatment for the severe mental disorder for 90 days or more within the year prior to the prisoner's parole or release." (Pen. Code, § 2962, subd. (c).) The success of such treatment is one of the factors used in the MDO evaluation. (Pen. Code, § 2962, subd. (d)(1).)

The fact that "[i]nvoluntary commitment under the MDO Act is directly related to the crime for which the defendant was incarcerated" distinguishes SVP's from MDO's. (*People v. Buffington, supra,* 74 Cal.App.4th at p.

1162.) Moreover, the MDO law targets persons with severe mental disorders that may be kept in remission with treatment (Pen. Code, § 2962, subd. (a)), whereas the SVPA targets persons with mental disorders that may never be successfully treated (Welf. & Inst. Code, § 6606, subd. (b)). "Given these contrasting backgrounds and expectations related to treatment, we cannot say the two groups are similarly situated in this respect for equal protection purposes." (*People v. Buffington, supra,* 74 Cal.App.4th at p. 1163.)

The LPS Act, in contrast to the SVPA, does not require that the person be serving a prison term at the time of evaluation for commitment. For this reason, persons committed under those two acts are not similarly situated "[o]n the issue of comparative treatment while in prison." (*People v. Buffington, supra,* 74 Cal.App.4th at p. 1162.)

In conclusion, we find no equal protection violation with respect to the fact that the SVPA does not provide for treatment while the person is serving his or her predicate prison term.

### 4. *Custody Credits*

■ Defendant claims that the time he was in custody after his scheduled release date and before the jury's SVP determination should count towards his two-year commitment. He claims that if no "custody credits" are permitted, the SVPA violates equal protection because the MDO law and NGI scheme do provide for such credits, as did the former scheme for mentally MDSO's (former Welf. & Inst. Code, § 6300 et seq.).

Defendant relies on Welfare and Institutions Code section 6604, which provides, in pertinent part: "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health, and the person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a petition for extended commitment under this article or unless the term of commitment changes pursuant to subdivision (e) of Section 6605."

Section 6604 does not specify when the two-year term of commitment begins. However, it does provide that a person may be committed only "[i]f the court or jury determines" that the person is an SVP. Thus, that statute links the two-year commitment period to the court's or jury's ultimate SVP determination, not to the end of the person's prison term.

In 1998, after the petition for commitment was filed in this case but before defendant's SVPA trial, the Legislature enacted Welfare and Institutions Code section 6604.1. (Stats. 1998, ch. 19, §§ 5, 10, eff. Apr. 14, 1998.) That section then provided: "The two-year term of commitment provided for in section 6604 shall commence on the date upon which the court issues the initial order of commitment pursuant to that section. The two-year term shall not be reduced by any time spent in a secure facility prior to the order of commitment. For subsequent extended commitments, the term of commitment shall be from the date of the termination of the previous commitment." (Welf. & Inst. Code, former § 6604.1.)

In enacting Welfare and Institutions Code section 6604.1 as urgency legislation, the Legislature included the following statement: "The Legislature finds and declares that the provisions of [the SVPA] establish a civil mental health commitment for a period of two years for persons found to be sexually violent predators and that, consistent with a civil mental health commitment, credits that may reduce a term of imprisonment are not applicable. Accordingly, the Legislature finds and declares that Section 5 of this act, which adds Section 6604.1 to the Welfare and Institutions Code, does not constitute a change in, but is declaratory of, existing law." (Stats. 1998, ch. 19, § 10.)

"It is well established, of course, that when the Legislature declares that an amendment is intended simply to 'clarify' the meaning of a preexisting version of a statute, such a declaration is not determinative as to the meaning of the earlier version. [Citation.]" (*People v. Cruz* (1996) 13 Cal.4th 764, 781 [55 Cal.Rptr.2d 117, 919 P.2d 731].) Although the Legislature's declaration is not binding upon this court, we find it persuasive and consistent with the legislative intent behind its enactment of the SVPA. Measuring the two-year term of commitment from the date of the commitment order, instead of the date of the SVP's release from prison, furthers the objectives of the SVPA. The Legislature's intent in enacting the SVPA was to confine and *treat* committed persons "until such time that it can be determined that they no longer present a threat to society." (Stats. 1995, ch. 763, § 1.) The Legislature has indicated that two years is an appropriate period for treatment of an SVP, unless an extension is necessary. To provide credit for time spent in custody without treatment would be inconsistent with the Legislature's intent to provide two years of treatment for SVP's.

We next turn to defendant's equal protection arguments. He first contends that the SVPA's denial of custody credits violates principles of equal protection because other civil commitment schemes do provide for custody credits.

As defendant points out, presentence custody credits were allowed for persons committed under the former MDSO law and are permitted for persons committed under the NGI scheme. (See *In re Huffman* (1986) 42 Cal.3d 552, 556 [229 Cal.Rptr. 789, 724 P.2d 475] [MDSO law]; *People v. Smith* (1981) 120 Cal.App.3d 817, 821, fn. 3, 822 [175 Cal.Rptr. 54] [NGI scheme].) However, in this respect, persons committed under the SVPA are not similarly situated to persons committed under the former MDSO law or NGI scheme. MDSO and NGI commitments are distinguished from SVPA commitments in that they are "wholly, or partly, in lieu of a prison sentence, and the maximum term of commitment is calculated by reference to the prison term that would otherwise be imposed, and the person may be returned to the criminal court under various circumstances." (*People v. Poe, supra*, 74 Cal.App.4th at p. 835.)

Defendant points out that the MDO law also provides for pretrial custody credits. (Pen. Code, § 2972.) He asserts that persons committed under the MDO law are similarly situated to persons committed under the SVPA for purposes of pretrial credits, since MDO commitments, like SVPA commitments, begin after a prison sentence is completed. We disagree that SVP's are similarly situated to MDO's for this purpose.

As discussed in the preceding part, MDO commitments are related to the crime for which the offender is in prison, and the MDO law requires the person be treated while in prison. (Pen. Code, §§ 2960, 2962, subd. (c).) A person may be committed for involuntary treatment during the period of his or her parole. (Pen. Code, § 2962.) If the person's severe mental disorder is not in remission or cannot be kept in remission without treatment at the end of the parole period, the district attorney may file a petition for continued involuntary treatment. (Pen. Code, § 2970; see generally *People v. Williams* (1999) 77 Cal.App.4th 436 [92 Cal.Rptr.2d 1]; *People v. Fernandez* (1999) 70 Cal.App.4th 117 [82 Cal.Rptr.2d 469].) Continued involuntary commitment "shall be for a period of one year from the date of termination of parole or a previous commitment or the scheduled date of release from prison as specified in Section 2970." (Pen. Code, § 2972, subd. (c).) Importantly, an MDO can be committed for continued involuntary treatment only if treatment "has been continuously provided." (Pen. Code, § 2970.)

As explained in the preceding part, SVPA commitments are not necessarily related to the crime for which the offender is in prison, and the SVP determination is not made until the person's prison term is about to end or has ended. An SVP's treatment thus does not begin until the commencement of his or her commitment. In this respect, SVP's are not similarly situated to MDO's. The fact that an MDO has been receiving treatment pending trial on

the petition for continued involuntary commitment justifies the fact that the MDO is entitled to credit for the time spent in treatment. An SVP, by contrast, does not receive treatment prior to trial. This distinction justifies the fact that an SVP's term of commitment is not reduced by any time spent in custody awaiting trial.

Defendant also argues that the SVPA's denial of custody credits violated equal protection as applied to him. He points out that he spent over four years in custody before he ultimately was found to be an SVP and committed to ASH, largely due to the fact that he challenged the petition for commitment, whereas persons who do not challenge petitions for commitment will spend less time in pretrial custody.

As to this argument, we find the *Poe* court's reasoning persuasive and therefore quote it here: "[I]f custody credits are not awarded, some SVP's will remain in custody longer than others, after their expected release date but before the commitment begins, based solely on the length of time it took to bring to trial the determination of their status as an SVP. It is equally true, however, that if credits were awarded for this period, persons with the same mental disorder and posing the same risk of reoffending would have different terms of commitment, not because of differences in their mental health, dangerousness, or need for treatment, but instead because one spent longer awaiting trial than the other. When enacting the SVP Act the Legislature 'expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes.' (*Hubbart v. Superior Court, supra*, 19 Cal.4th 1138, 1144.) To the extent that any disparate treatment might result, from the decision not to award credits, or from the decision to define the term as commencing upon entry of the initial commitment order, it is justified by the state's compelling interest in ensuring each person committed as an SVP, receive a maximum term of two years of treatment, and to protect the public from premature release of a person whose mental disorder makes it likely that he or she will engage in sexually violent behavior." (*People v. Poe, supra*, 74 Cal.App.4th at p. 836; see also *People v. Ward* (1999) 71 Cal.App.4th 368, 376 [83 Cal.Rptr.2d 828].)

In summary, we conclude that the SVPA does not violate equal protection by denying defendant credit for the time he spent in custody after his scheduled release date from prison and before his SVP trial.

### B. *Other Federal Constitutional Claims*

Defendant raises several claims that were considered and rejected by the California Supreme Court in *Hubbart v. Superior Court, supra*, 19 Cal.4th

1138. He acknowledges this court is bound by the doctrine of stare decisis (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]) and explains he presents the claims simply to preserve the issue for future review.

### 1. *Ex Post Facto/Double Jeopardy*

 Defendant contends the SVPA is punitive in nature and that it violates the federal constitutional prohibitions against ex post facto laws and double jeopardy. In *Hubbart v. Superior Court, supra,* 19 Cal.4th at pages 1171-1177, the California Supreme Court determined that the SVPA does not impose punishment for criminal conduct and thus does not implicate ex post facto concerns. That holding is binding on this court (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455) and disposes of defendant's double jeopardy claim by necessary implication. The determination that the act is not punitive "removes an essential prerequisite for both . . . double jeopardy and *ex post facto* claims." (*Hendricks, supra,* 521 U.S. at p. 369 [117 S.Ct. at p. 2075].)[2]

### 2. *Due Process*

Defendant next contends the SVPA's definition of the term "diagnosed mental disorder" (Welf. & Inst. Code, § 6600, subd. (c)) violates due process because it essentially defines someone with a mental disorder as one who commits sexual offenses. He also argues that paraphilia cannot constitutionally form the basis for an SVPA commitment because there is no consensus, in the mental health field, as to whether it is a genuine mental disorder. In *Hubbart v. Superior Court, supra,* 19 Cal.4th at pages 1152-1161, the California Supreme Court rejected essentially the same arguments. (See also *Hendricks, supra,* 521 U.S. 346.) We are again bound by the conclusion reached by our high court. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.)

### C. *Legal Custody*

 On March 16, 1993, defendant's parole was revoked and he was taken into custody pursuant to California Code of Regulations, title 15, section 2616, former subdivision (a)(7). In 1994, defendant filed a petition for writ of habeas corpus in the California Supreme Court, arguing that he

---

[2]Defendant does not present an "as applied" challenge to the SVPA on ex post facto or double jeopardy grounds. We note that the United States Supreme Court recently held that an "as applied" challenge to Washington's SVP law was precluded by the Washington Supreme Court's determination that the SVP law was civil rather than criminal. (*Seling v. Young* (2001) 531 U.S. 250, 261 [121 S.Ct. 727, 729, 148 L.Ed.2d 734].)

was not in lawful custody. The California Supreme Court denied the habeas corpus petition on May 18, 1995. On January 2, 1996, while defendant remained in custody pursuant to former subdivision (a)(7), the SVPA petition was filed.

California Code of Regulations, title 15, section 2616 lists the "kinds of behavior" that must be reported as a parole violation. Former subdivision (a)(7) provided: "Psychiatric Treatment. Facts indicating the parolee is suffering from a mental disorder which substantially impairs the parolee's ability to maintain himself or herself in the community, or which makes the parolee a danger to himself/herself or others, when necessary psychiatric treatment cannot be obtained in the community."

Former subdivision (a)(7) of California Code of Regulation, title 15, section 2616 was invalidated by *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864 [76 Cal.Rptr.2d 841] (*Terhune*), and it was repealed on May 10, 1999. In *Terhune*, the defendant had served a determinate prison term. Before his release into the community, his parole was revoked pursuant to former subdivision (a)(7). The court held that the revocation was an act in excess of the authority conferred upon the Board of Prison Terms: "[A]lthough the Legislature has vested the Board with broad power both to impose conditions of parole and to revoke parole, it has also decreed that the Board has no discretion to withhold parole to a prisoner who has served a determinate term. Admittedly no statute expressly precludes parole revocation prior to release based solely on concerns about an inmate's mental condition and need for psychiatric treatment. Nevertheless, the Legislature has directly addressed the public safety and treatment concerns such individuals present by supplementing the LPS Act with the MDO Law and the SVP Act. Each of those acts applies to a precisely defined category of individuals, prescribes a detailed sequence of evaluations and procedures that must be followed, and affords the affected individuals mandatory procedural safeguards, including the right to a jury trial, before civil commitment can occur. When considered together with Penal Code section 3000, subdivision (b)(1), the mandatory parole release provision of the determinate sentencing law, these statutes impliedly reflect a legislative choice to require the Department and the Board to utilize one of these acts when confronted with the problem of the potentially dangerous mentally disordered inmate. Because the Legislature has so fully occupied the subject matter, we conclude that the Board's utilization of the expedient of parole revocation under section 2616(a)(7) instead of civil commitment for the mentally disordered inmate who is about to be released into the community on parole is unauthorized." (*Terhune*, at p. 878.)

Defendant argues that lawful custody is a prerequisite for commitment under the SVPA, and that because he was not in lawful custody at the time the petition for commitment was filed, his commitment is invalid.[3]

At the time the petition for commitment was filed, Welfare and Institutions Code section 6601 specified that SVPA proceedings could be instituted against "an individual who is in custody under the jurisdiction of the Department of Corrections, and who is either serving a determinate prison sentence or whose parole has been revoked." (Welf. & Inst. Code, § 6601, subd. (a), as enacted, Stats. 1995, ch. 763, § 3.)

In 1999, the Legislature added the following language to section 6601: "A petition may be filed under this section if the individual was in custody pursuant to his or her determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition is filed. A petition shall not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law. This paragraph shall apply to any petition filed on or after January 1, 1996." (Welf. & Inst. Code, § 6601, subd. (a)(2), Stats. 1999, ch. 136, § 1, eff. July 22, 1999.)

In amending section 6601, the Legislature included the following statement: "The Legislature finds and declares that paragraph (2) of subdivision (a) of Section 6601 is declaratory of existing law. The Sexually Violent Predator Act authorizes civil commitment of persons who pose a danger as a result of a mental disorder if released from custody. Therefore, where a petition for commitment of a sexually violent predator has been filed, it is not the intent of the Legislature that a person be released based upon a subsequent judicial or administrative finding that all or part of a determinate prison sentence, parole revocation term, or a hold placed pursuant to Section 6601.3, was unlawful." (Stats. 1999, ch. 136, § 3.)

A number of published cases have rejected the argument that lawful custody was a jurisdictional prerequisite to the filing of an SVPA petition prior to the amendment of section 6601. (*People v. Wakefield* (2000) 81 Cal.App.4th 893, 898-899 [97 Cal.Rptr.2d 221]; *People v. Hedge, supra*, 72 Cal.App.4th 1466, 1478-1479 [86 Cal.Rptr.2d 52]; *People v. Superior Court (Whitley)* 68 Cal.App.4th 1383, 1389-1390 [81 Cal.Rptr.2d 189]; *Garcetti v.*

---

[3]While the California Supreme Court was considering the issues in *Hubbart v. Superior Court, supra*, 19 Cal.4th 1138, defendant presented this argument to the trial court in a petition for writ of habeas corpus. The trial court denied the habeas corpus petition on December 22, 1998.

*Superior Court* (1998) 68 Cal.App.4th 1105, 1117-1118 [80 Cal.Rptr.2d 724].) We agree with the analysis of those courts.

At the time the petition was filed, the SVPA contained no explicit requirement that a defendant's custody be lawful; it required only that the person alleged to be an SVP was "in custody under the jurisdiction of the Department of Corrections." (Welf. & Inst. Code, § 6601, subd. (a), as enacted, Stats. 1995, ch. 763, § 3.) At the time the petition for commitment was filed, defendant *was* "in custody under the jurisdiction of the Department of Corrections": his parole had been revoked pursuant to California Code of Regulations, title 15, section 2616, subdivision (a)(7). At the time, no judicial or administrative decision had addressed the validity of that regulation. The decision in *Terhune* was not rendered until after the petition to commit defendant had been filed. Thus, defendant has made no showing that his parole was revoked in bad faith.

Analogous circumstances existed in *People v. Dias* (1985) 170 Cal.App.3d 756 [216 Cal.Rptr. 295]. There, the defendant was committed under the former MDSO law. His release date was originally calculated to be November 12, 1981, but it was subsequently recalculated to be April 21, 1984, based on the theory that the time he spent as an outpatient should not count towards his commitment. On August 30, 1983, a petition for extended commitment was filed. On appeal from that extended commitment, the defendant argued that his time spent as an outpatient should have counted toward his commitment period. The court agreed. It then addressed the fact that, properly calculated, his commitment period had expired before the petition for extended commitment was filed. The court explained that "an order for extended commitment will generally be void if the petition was filed after the commitment expired" but that such an order would be valid "if, as a result of legislative or judicial change, the term expired without a reasonable opportunity to prepare and file the petition." (*Id.* at pp. 762-763.) As the error there had "resulted from a mistake of law" and there was "no hint of negligent or intentional wrongdoing," the defendant's extended commitment was upheld. (*Id.* at p. 763; see also *People v. Minahen* (1986) 179 Cal.App.3d 180, 191 [224 Cal.Rptr. 460] [NGI extended commitment upheld although petition was untimely due to error in calculating maximum term].)

Here, as in *Dias*, the error resulted from a mistake of law. The Department of Corrections relied on a regulation that was apparently valid: at the time, there was no controlling judicial decision directly on point. The regulation was invalidated only after the petition for commitment was filed. There is no evidence of any negligence or intentional wrongdoing here. (Cf. *People v.*

*Superior Court (Whitley)*, *supra*, 68 Cal.App.4th at pp. 1389-1390; *Garcetti v. Superior Court, supra*, 68 Cal.App.4th at p. 1118.)

■ We now turn to defendant's argument that an SVPA commitment resulting from unlawful custody denies an SVP due process. " '[D]ue process under the SVP Act is not measured by the rights accorded a defendant in criminal proceedings, but by the standard applicable to civil proceedings: The extent of due process protection which must be accorded a civil litigant is tested by consideration of four factors: (1) " ' "the private interest [which] will be affected by the official action" ' "; (2) " ' "the risk of an erroneous deprivation . . . through the procedures used" ' "; (3) " ' "the probable value, if any, of additional or substitute procedural safeguards," ' " and (4) " 'the . . . interest in informing individuals . . . of the action and in [allowing] them to present their side of the story.' " . . .' . . . '[W]hile the alleged sexually violent predator has a strong liberty interest, the government also has a strong interest in protecting the public from persons who are dangerous to others. . . .' " (*People v. Superior Court (Butler)* (2000) 83 Cal.App.4th 951, 965 [100 Cal.Rptr.2d 199], citations omitted.)

■ We do not believe that an SVPA commitment resulting from unlawful custody violates due process where, as here, the unlawful custody was the result of a good faith error and where, as here, the SVP is provided with numerous procedural safeguards. A person in unlawful custody who is alleged to be an SVP still has all of the procedural safeguards that the SVPA provides in order to decrease the risk of an erroneous liberty deprivation. A petition for commitment may only be filed if two psychologists or psychiatrists concur that the person meets the criteria for commitment as an SVP. (Welf. & Inst. Code, § 6601, subd. (d).) Thereafter, the person has the right to a probable cause hearing. (Welf. & Inst. Code, § 6602, subd. (a).) Finally, the person has the right to trial by jury, at which the People must prove beyond a reasonable doubt that he or she is an SVP. (Welf. & Inst. Code, § 6603, subd. (a).) The person has the right to the assistance of counsel at both the probable cause hearing and at trial. (Welf. & Inst. Code, §§ 6602, subd. (a), 6603, subd. (a).) At trial, the person also has the right to retain experts and has access to all relevant medical and psychological reports. (Welf. & Inst. Code, § 6603, subd. (a).)

In light of the procedural safeguards provided to a person alleged to be an SVP, we conclude there is no due process violation where the person was not in lawful custody at the time the petition was filed. (See *People v. Superior Court (Whitley)*, *supra*, 68 Cal.App.4th at p. 1390.) We emphasize that, as explained above, the lawful custody must result from a good faith error rather than negligent or intentional wrongdoing.

Defendant also argues that his commitment violates equal protection because it is attributable to his unlawful custody. He asserts that he is similarly situated to persons who otherwise meet the criteria for commitment under the SVPA but who are not in custody pursuant to an unlawful regulation. We disagree. Even assuming that defendant is similarly situated to persons who are not in custody, the difference in treatment is justified under the strict scrutiny standard. The SVPA is narrowly tailored to apply to "a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders [who] can be identified while they are incarcerated." (Stats. 1995, ch. 762, § 1.) There is certainly a compelling state interest in identifying, confining, and treating persons who represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. (See *Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1153, fn. 20.) In order to further this compelling state interest, the SVPA makes a necessary distinction between persons already in custody and persons not in custody.

Defendant also asserts that he is similarly situated to persons who are in unlawful custody but receive timely habeas corpus relief. He notes that he applied to the California Supreme Court for habeas corpus relief in 1994, contending that his parole had been unlawfully revoked under former subdivision (a)(7) of California Code of Regulations, title 15, section 2616. The California Supreme Court denied that habeas corpus petition. Defendant asserts that because of the subsequent *Terhune* decision, other defendants will now be able to successfully challenge their unlawful parole revocations. However, this change in the law does not provide a basis for relief. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1151 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

In conclusion, we hold that defendant's SVPA commitment is not rendered invalid by the fact that he was not in lawful custody at the time the petition was filed.

### D. *Standard of Proof*

The trial court instructed the jury on the burden of proof for commitment under the SVPA pursuant to CALJIC No. 4.19. As given, the instruction read, in full: "A petition for commitment has been filed with the Court alleging the respondent, Christopher Hubbart, is a sexually violent predator. [¶] The term sexually violent predator means a person who, one, has been convicted of a sexually violent offense against two or more victims with whom he had a predatory relationship as defined in this instruction for which he received a determinate sentence, and two, has a currently diagnosed mental disorder that makes him a danger to the health and safety of

others, in that it is likely that he will engage in sexually violent criminal behavior. [¶] Sexually violent offense includes forcible rape, forcible sodomy and forcible oral copulation. [¶] A diagnosed mental disorder includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others. [¶] Danger to the health and safety of others does not require proof of a recent overt act while the offender is in custody. [¶] Recent overt act means criminal act that manifests a likelihood the actor may engage in sexually violent predatory criminal behavior. [¶] Predatory means an act directed towards a stranger. [¶] This is not a criminal trial. However, the petitioner has the burden of proving beyond a reasonable doubt the respondent is a sexually violent predator. [¶] Petitioner must prove beyond a reasonable doubt that respondent currently suffers from a currently diagnosed mental disorder which prevents him from controlling his sexually violent behavior thereby making him dangerous and likely to reoffend. It is the inability to control sexually violent behavior which gives rise to the likelihood he will commit sexually violent crimes unless confined. [¶] Reasonable doubt in these proceedings is defined as follows: It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. [¶] It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction that the respondent is a sexually violent predator. [¶] In determining whether the respondent is a sexually violent predator, you should consider all the evidence introduced in the case, including the prior convictions of one or more crimes previously listed for you. [¶] However, you may not find respondent to be a sexually violent predator based on prior offenses without evidence of a currently diagnosed mental disorder that makes him a danger to the health and safety of others, in that it is likely that he will engage in sexually violent criminal behavior. [¶] You must not be influenced by pity for or prejudice against the respondent. You must not be biased against the respondent because the petition has been filed or because the trial is being conducted. You must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. [¶] Both parties have a right to expect that you will conscientiously consider and weigh the evidence, apply the law and reach a just verdict regardless of the consequences. [¶] If, after a consideration of all the evidence, you have a reasonable doubt that the respondent is a sexually violent predator, you must find that he is not a sexually violent predator and find the allegation in the petition is untrue."

Defendant contends the above instruction is self-contradictory and confusing, because while it specifies that the prosecution must prove "*beyond a*

*reasonable doubt* the respondent is a sexually violent predator," it also defines a "sexually violent predator" as a person who has been convicted of two qualifying offenses and has a "currently diagnosed mental disorder that makes him a danger to the health and safety of others, in that it is *likely* that he will engage in sexually violent criminal behavior." (Italics added.)

" 'When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 289 [99 Cal.Rptr.2d 532, 6 P.3d 193].) We find no such reasonable likelihood here.

CALJIC No. 4.19 does not state or imply that the phrase "likely that he will engage in sexually violent criminal behavior" is the standard of proof for the ultimate SVPA determination. (See *People v. Buffington, supra,* 74 Cal.App.4th at p. 1153.) The instruction specifies that "Petitioner must prove beyond a reasonable doubt that respondent currently suffers from a currently diagnosed mental disorder which prevents him from controlling his sexually violent behavior thereby making him dangerous and likely to reoffend." Thus, the instruction makes it clear that the jury must find *beyond a reasonable doubt* that the person is *dangerous* due to his or her mental disorder and lack of volitional control. Moreover, the instruction provides a detailed definition of the phrase "reasonable doubt," thereby further emphasizing that reasonable doubt is the standard the jury must apply. Under this instruction, any reasonable jury would be entirely capable of separating the criteria of finding it "likely" that the person will engage in sexually violent criminal behavior from the standard of proof of "beyond a reasonable doubt." We find no instructional error in this regard.

### E. *Evidence of Defendant's Prior Sexual Assaults*

 Defendant contends the trial court erred by admitting detailed evidence of numerous sexual assaults he committed from 1980 to 1982. The evidence was presented through defendant's testimony on behalf of the prosecution.

After defendant testified about the two San Francisco rapes he committed in December of 1980 and January of 1981, trial counsel stated an objection pursuant to Evidence Code section 352: "I'm concerned about the pace we're going on the offenses. There are nineteen police reports relating to Sunnyvale. Seems to me to go through each one is taking too much time. It's cumulative, it is prejudicial. [¶] There are groups of offenses where he will

admit each one, but to go through each offense in that kind of detail is going to take days. [¶] I think under [Evidence Code, section] 352, the Court should exercise some discretion and attempt to condense this. . . ." Trial counsel also argued that the evidence would be cumulative because defendant's admissions would be introduced by a detective and two doctors.

The prosecutor responded that she "would like to go a little bit quicker." She also explained that she was going into the details of the offenses "to show the extent of his mental illness at the time as well as to present some issues that are relevant to the ultimate opinion on re[cid]ivism." The prosecutor indicated she anticipated that defendant's testimony would be finished in time to call a second witness that day. She also indicated that the two doctors would not go into the details of defendant's offenses, but simply "summarize the salient characteristics."

The trial court overruled defendant's objection but noted, "I would like it to speed up some." Thereafter, the prosecutor resumed her direct examination of defendant, who testified as described above.

Defendant contends the trial court should have sustained his Evidence Code section 352 objection. Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review the trial court's determination of admissibility under Evidence Code section 352 for abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 449 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

The testimony about defendant's string of sex offenses in 1981 and 1982 was highly probative of the two issues that the jury had to decide: whether defendant had a diagnosed mental disorder that made him a danger to the health and safety of others; and whether, due to that mental disorder, defendant was likely to engage in sexually violent behavior if released. Details about defendant's past sexually violent conduct were important to the jury's determination of these issues. The way that defendant targeted similar victims and committed the crimes in a similar manner showed his predatory behavior and the risk he posed if released. Although there was expert testimony on those issues, the details of the crimes were helpful for the jury's understanding of the experts' opinions and diagnoses. Although the details of the crimes were odious, it was necessary for the jury to learn not just that defendant had committed numerous sex offenses, but the scope and nature of his sexually predatory behavior.

As noted above, the prosecutor promised to proceed at a faster pace, and the trial court urged her to speed up this portion of her case. The record reflects that the prosecutor did go through the numerous offenses relatively quickly. There was little potential for the jury to be misled or confused about the issues. Defendant admitted committing each offense, and the jury was clearly instructed that it was to determine beyond a reasonable doubt whether defendant fit the criteria for commitment under the SVPA, not whether defendant committed the 1981 and 1982 offenses. Moreover, the bulk of the People's case consisted of the psychologists' testimony.

Under these circumstances, we conclude that the trial court did not abuse its discretion by overruling defendant's objection to admission of the details of his sex offenses.

### F. *Cumulative Error*

Defendant's final argument is that reversal is required due to the cumulative effect of the errors he has alleged. However, we have concluded that each of defendant's claims of trial error lacks merit; therefore, there is no cumulative error.

### DISPOSITION

The judgment is affirmed.

Premo, Acting P. J.; and Wunderlich, J., concurred.

A petition for a rehearing was denied June 7, 2001, and appellant's petition for review by the Supreme Court was denied August 15, 2001. George, C. J., and Werdegar, J., did not participate therein.