[No. B161077. Second Dist., Div. One. May 28, 2003.]

THE PEOPLE, Plaintiff, v.
KENNETH CIANCIO, Defendant and Respondent;
STATE DEPARTMENT OF MENTAL HEALTH, Objector and Appellant.

[And 13 other cases.*]

*People v. Babinski* (No. ZM002056); *People v. Anderson* (No. ZM002081); *People v. Salcido* (No. ZM002358); *People v. Faith* (No. ZM002359); *People v. Weathington* (No. ZM002379); *People v. Reynolds* (No. ZM002447); *People v. Groen* (No. ZM002696); *People v. Marentez* (No. ZM002909); *People v. Slago* (No. ZM003099); *People v. King* (No. ZM003757); *People v. Blake* (No. ZM003762); *People v. Parker* (No. ZM003917); *People v. Lyles* (No. ZM004713).

## COUNSEL

Bill Lockyer, Attorney General, James Humes, Assistant Attorney General, John H. Sanders, Randall R. Murphy, Karen Ackerson-Brazille and Eric Bates, Deputy Attorneys General, for Objector and Appellant.

Michael P. Judge, Public Defender, Albert J. Menaster, Michael Suzuki and Jack T. Weedin, Deputy Public Defenders, for Defendants and Respondents Kenneth Ciancio, Albert Salcido, Anthony Weathington, Niek Groen, Paul Marentez, Michael Slago and Patrick Parker.

Jonathan Mandel for Defendants and Respondents Brian Babinski, Victor Reynolds and Carnot Lyles.

Jean F. Matulis, under appointment by the Court of Appeal, for Defendants and Respondents Donald Anderson, William King, Barry Blake and Fred Faith.

## OPINION

**MALLANO, J.**—In this case of first impression, we address the issue of whether male alleged sexually violent predators (alleged SVP's) under the Sexually Violent Predators Act (SVPA or Act) (Welf. & Inst. Code, § 6600

et seq.), who were released from prison and are being detained pending trial in the Los Angeles County jail (county jail), are entitled to appropriate housing outside the county jail and psychiatric treatment under the SVPA. Such treatment is not currently provided at the county jail. The alleged SVP's, who were at different stages of pretrial proceedings, filed motions contending that their detentions in the county jail violated the SVPA and Penal Code sections 1610 and 4002 because they were not afforded any psychiatric care or treatment when confined in the county jail. They sought housing in Atascadero State Hospital (ASH) or a local mental hospital or psychiatric facility which could provide such treatment.

After hearing on the motions, the court issued an order on June 25, 2002, directing that all alleged SVP's being detained in the county jail pending trial were entitled to the opportunity to receive psychiatric care and treatment, that such treatment was to be "under the direction of the Department of Mental Health," and that the focus of the order was "not necessarily the location of placement [of the alleged SVP's], but the guarantees of continuous treatment." Those alleged SVP's who had received a probable cause determination were ordered transferred to ASH or, in the alternative, to receive treatment.

The State Department of Mental Health (DMH) appeals from the June 25, 2002 order, challenging the trial court's exercise of personal jurisdiction over it and the motion procedure leading up to the order, as well as the correctness of the order itself. We reverse that part of the order purporting to apply in a blanket fashion to all alleged SVP's being detained in the county jail, including those who had not filed any motion or made any request for treatment, because there is no statutory provision mandating treatment before trial and adjudication as an SVP. But we hold that Welfare and Institutions Code section 6602.5[1] and Penal Code section 4002, subdivision (b)[2] permit the trial court to order precommitment treatment for alleged SVP's who have had a probable cause determination or who have already

---

[1] Unless otherwise specified, statutory references are to the Welfare and Institutions Code.

Section 6602.5, subdivision (a) provides in pertinent part: "No person may be placed in a state hospital pursuant to the provisions of this article until there has been a determination pursuant to Section 6601.3 or 6602 that there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior." Section 6602 sets out the procedures for the probable cause hearing. Section 6601.3 allows the Board of Prison Terms, with good cause, to hold an alleged SVP in custody for up to 45 days beyond his release date for the purpose of conducting the mental health evaluation under section 6601.

[2] Penal Code section 4002 is in a chapter dealing with county jails. Section 4002, subdivision (b) provides: "Inmates who are held pending civil process under the sexually violent predator laws shall be held in administrative segregation. For purposes of this subdivision, administrative segregation means separate and secure housing that does not involve any

begun a course of psychiatric treatment. Accordingly, as to those alleged SVP's who filed motions below or otherwise applied to the trial court requesting treatment, we conclude the following: (1) The order is affirmed as to those alleged SVP's who have had probable cause determinations and were ordered to be placed in ASH because placement in a state hospital, where treatment is afforded, is permitted by section 6602.5. (2) As to those alleged SVP's who have not had a probable cause determination and as to those post-probable-cause SVP's who may be housed at ASH but temporarily placed in the county jail pending court appearances, the order for treatment is reversed and the matters are remanded for further proceedings pursuant to Penal Code section 4002, subdivision (b), because the trial court misinterpreted the statute and failed to make appropriate findings to support an order for treatment pursuant to its provisions.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Overview of the SVPA*

In enacting the SVPA in 1996, "the Legislature expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes. The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA is warranted immediately upon their release from prison. The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public. No punitive purpose was intended." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143-1144 [81 Cal.Rptr.2d 492, 969 P.2d 584].) According to an uncodified statement accompanying the Act, " '[i]t is the intent of the Legislature that these individuals be committed and treated for their disorders only as long as the disorders persist and not for any punitive purposes.' (Stats. 1995, ch. 763, § 1.)" (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1144, fn. 5.)

"The requirements for classification as an SVP are set forth in section 6600, subdivision (a) and related provisions. [Citation.] . . . [F]irst an SVP

---

deprivation of privileges other than what is necessary to protect the inmates and staff. Consistent with [Penal Code] Section 1610, to the extent possible, the person shall continue in his or her course of treatment, if any. An alleged sexually violent predator held pending civil process may waive placement in secure housing by petitioning the court for a waiver. In order to grant the waiver, the court must find that the waiver is voluntary and intelligent, and that granting the waiver would not interfere with any treatment programming for the person requesting the waiver. A person granted a waiver shall be placed with inmates charged with similar offenses or with similar criminal histories, based on the objective criteria set forth in subdivision (a)."

must suffer from 'a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' (§ 6600, subd. (a)(1) . . . .) Second, an SVP must have been 'convicted of a sexually violent offense against two or more victims.' (§ 6600, subd. (a)(1) . . . .)" (*People v. Otto* (2001) 26 Cal.4th 200, 205 [109 Cal.Rptr.2d 327, 26 P.3d 1061].)

"The process for determining whether a convicted sex offender meets the foregoing requirements takes place in several stages, both administrative and judicial. Generally, the Department of Corrections screens inmates in its custody who are 'serving a determinate prison sentence or whose parole has been revoked' at least six months before their scheduled date of release from prison. (§ 6601, subd. (a).) This process involves review of the inmate's background and criminal record, and employs a 'structured screening instrument' developed in conjunction with the Department of Mental Health. (*Id.*, subd. (b).) If officials find the inmate is likely to be an SVP, he is referred to the Department of Mental Health for a 'full evaluation' as to whether he meets the criteria in section 6600. (§ 6601, subd. (b).)" (*Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1145, fn. omitted.)

"The evaluation performed by the Department of Mental Health must be conducted by at least two practicing psychiatrists or psychologists in accordance with a standardized assessment protocol. (§ 6601, subds. (c) and (d).) . . . [¶] Two evaluators must agree that the inmate is mentally disordered and dangerous within the meaning of section 6600 in order for proceedings to go forward under the Act. (§ 6601, subd. (d).) In such cases, the Department of Mental Health transmits a request for a petition for commitment to the county in which the alleged SVP was last convicted, providing copies of the psychiatric evaluations and any other supporting documentation. [Citation.] 'If the county's designated counsel concurs with the recommendation, a petition for commitment shall be filed in the superior court . . . .' " (*Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1146, fn. omitted.)

"The filing of the petition triggers a new round of proceedings under the Act. The superior court first holds a hearing to determine whether there is 'probable cause' to believe that the person named in the petition is likely to engage in sexually violent predatory criminal behavior upon release. (§ 6602 . . . .) . . . If no probable cause is found, the petition is dismissed. However, if the court finds probable cause within the meaning of this section, the court orders a trial to determine whether the person is an SVP under section 6600. The alleged predator must remain in a 'secure facility' between the time probable cause is found and the time trial is complete. (§ 6602.)" (*Hubbart v. Superior Court, supra,* 19 Cal.4th at pp. 1146-1147, fn. omitted.)

Pursuant to section 6601.5, upon the filing of the petition and a request for review, the court must review the petition to determine whether, on its face, it contains sufficient facts that, if true, would support a finding of probable cause; if the judge determines the petition is sufficient on its face, "the judge shall order that the person be detained in a secure facility until a hearing can be completed pursuant to Section 6602. The probable cause hearing provided for in Section 6602 shall commence within 10 calendar days of the date of the order issued by the judge pursuant to this section." (§ 6601.5.)

"The trier of fact is charged with determining whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt.' (§ 6604.) Any jury verdict on the issue must be 'unanimous.' (§ 6603, subd. (d).) If the state fails to carry this burden, the person is released from prison when his term expires. (§ 6604.) However, where the requisite SVP findings are made, 'the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health . . . .' (*Ibid.*) Confinement generally cannot exceed two years unless a new petition is filed and an extended commitment is obtained from the court." (*Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1147.)

After commitment of the SVP, DMH is required to provide programming "which shall afford the person with treatment for his or her diagnosed mental disorder." (§ 6606, subd. (a).) "This treatment obligation exists even where the chance of success in a particular case is low" (*Hubbart v. Superior Court, supra,* 19 Cal.4th at pp. 1148-1149), and even where the SVP is not "amenable" to treatment. "Amenability to treatment is not required for a finding that any person is a person described in Section 6600, nor is it required for treatment of that person." (§ 6606, subd. (b).) "This provision appears to stand for the unremarkable proposition that some mentally disordered and dangerous persons might not benefit from treatment for a variety of reasons, and that commitment is not foreclosed in those cases." (*Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1167.) Yet the obligation of DMH to provide appropriate treatment programs for SVP's "stems from an apparent legislative determination that 'meaningful' treatment is not impossible or unavailable in this context, particularly where the needs and progress of individual SVP's are taken into account. (See § 6606, subd. (c).)" (*Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1178.)

DMH is thus obligated to provide programming "consistent with current institutional standards for the treatment of sex offenders," and "based on a structured treatment protocol developed by the State Department of Mental Health. The protocol shall describe the number and types of treatment

components that are provided in the program, and shall specify how assessment data will be used to determine the course of treatment for each individual offender. The protocol shall also specify measures that will be used to assess treatment progress and changes with respect to the individual's risk of reoffense." (§ 6606, subd. (c).)

The two-year term of commitment is measured from the date of the commitment order; there is no credit for the time an SVP is in custody after being released from prison but before the commitment order. (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1222-1223 [106 Cal.Rptr.2d 490].) In addition, the Act does not require the People to complete the commitment process within a certain amount of time. (*People v. Talhelm* (2000) 85 Cal.App.4th 400, 407-408 [102 Cal.Rptr.2d 150].) Yet, after commitment, unless the SVP waives the right to a hearing, "the court must annually set a 'show cause hearing' to determine whether there is 'probable cause' to believe that the person's diagnosed mental disorder has 'so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged.' (§ 6605, subds. (b) & (c).) If the court so finds, the SVP is entitled to a full hearing with the same basic rights afforded at the initial commitment proceeding. . . . A favorable verdict entitles the SVP to unconditional release and discharge." (*Hubbart v. Superior Court, supra*, 19 Cal.4th at pp. 1147-1148, fn. omitted.) "There also are two ways for an SVP to be conditionally released from confinement. First, the Director of Mental Health may file with the court 'a report and recommendation for conditional release' . . . . [¶] Second, the SVP may 'petition[ ] the court for conditional release and subsequent unconditional discharge without the recommendation or concurrence of the Director of Mental Health.' " (*Id.* at p. 1148.)

" 'Secure facility' has a particularized meaning under a provision added and refined shortly after the Act came into existence." (*Hubbart v. Superior Court, supra*, 19 Cal.4th at p. 1147, fn. 11.) "Until a permanent housing and treatment facility is available, Atascadero State Hospital shall be used whenever a person is committed to a secure facility for mental health treatment pursuant to this article and is placed in a state hospital under the direction of the State Department of Mental Health unless there are unique circumstances that would preclude the placement of a person at that facility. If a state hospital is not used, the facility to be used shall be located on a site or sites determined by the Director of Corrections and the Director of Mental Health. In no case shall a person committed to a secure facility for mental health treatment pursuant to this article be placed at Metropolitan State Hospital or Napa State Hospital." (§ 6600.05.)

ASH is a maximum security forensic hospital operated by DMH. In June 2002, ASH housed about 1,092 male psychiatric patients who had been

committed through the criminal justice system or through civil judicial commitments, including SVP's. ASH admits alleged SVP patients pursuant to section 6602.5 after a probable cause determination has been made. (See fn. 1, *ante*.) Currently, care for the mentally disordered is afforded at three other state hospitals: Metropolitan State Hospital, Napa State Hospital, and Patton State Hospital. The one female SVP is being hospitalized and treated at Patton State Hospital. A permanent SVP facility for male SVP's is currently being built in Coalinga, California.

As stated in the trial court's June 25, 2002 order, statistics available to the court established that there were then 203 alleged SVP's detained in county jail or at ASH; 76 alleged SVP's were awaiting a probable cause hearing; 69 alleged SVP's were being held for trial after probable cause was found. Eight alleged SVP's had probable cause hearings set in 1996, 4 had such hearings in 1997, 3 in 1998, 3 in 1999, 21 in 2000, 30 in 2001, and 6 in 2002. Two SVP's had completed their trials in 1997, 11 had completed their trials in 1998, 30 in 1999, 19 in 2000, 8 in 2001, and 1 in 2002.

B. *Trial Court Proceedings*

Early in 2002, a group of male alleged SVP's at various stages of their commitment proceedings filed in the superior court substantially similar motions, or joined in motions, requesting appropriate housing and treatment. Because no psychiatric care or treatment was offered in the county jail, alleged SVP's who were detained in the county jail requested that they be transferred to ASH or another mental hospital or psychiatric facility. Those alleged SVP's who were already housed at ASH (that is, those who had probable cause determinations and were awaiting trial) requested that they not be housed in the county jail but in another mental health facility when they had to leave ASH temporarily for court appearances and trial. The motions were based on the provisions of the SVPA, as well as recent amendments to Penal Code sections 1610, subdivision (b), and 4002. (See fn. 3, *post*, and fn. 2, *ante*.)

In March 2002, the court issued similar orders to show cause (OSC) with respect to six of the alleged SVP's who had filed motions for appropriate housing and treatment, including Kenneth Ciancio, Albert Salcido, Patrick Parker, Anthony Weathington, Niek Groen, and Barry Blake. The OSC for Ciancio stated in pertinent part: "The Court issues an order to show cause to the Attorney General of the State of California, the State of California Department of Mental Health and the Los Angeles County Community Program Director—Gateways Conrep Administration as to why [Ciancio] should not be housed in the State hospital or other appropriate facility and

have continued treatment and not be deprived of any of the privileges that Penal Code Section 1610(b) requires and accorded treatment under Welfare and Institutions Code Sections 5325 and 5325.1 when [Ciancio] is brought to Los Angeles County Jail for confinement prior to trial." Proceedings on the OSC's were scheduled for April 17, 2002. DMH was served with the OSC's.

In response to the OSC's, the Attorney General filed documents in each case captioned "Special Appearance by the Attorney General of the State of California and the State Department of Mental Health re: Applicability of Penal Code section 1610(b) and Welfare and Institutions Code sections 5325 and 5325.1."[3] DMH and the Attorney General argued in each "Special Appearance" document that they appeared "for the sole purpose of challenging [the alleged SVP's] claim to entitlement of commitment to a state mental hospital and coverage under Penal Code Section 1610(b) and Welfare and Institutions Code Sections 5325 and 5325.1."[4] In the documents captioned "Special Appearance," DMH requested that the motions of the SVP's be denied. DMH also asserted that it was not a party to the commitment

---

[3]Penal Code section 1610 deals with the matter of confinement of committed SVP's and other mentally disordered and developmentally disabled persons who are on outpatient status and who are awaiting a ruling on a request to revoke that outpatient status. Under certain circumstances, the community program director may request a peace officer to take such a person into custody and to "transport the person to a facility designated by the community program director for confinement under this section." (Pen. Code, § 1610, subd. (a).)

Under subdivision (b) of Penal Code section 1610, the facility designated by the community program director may be "a state hospital, a local treatment facility, a county jail, or any other appropriate facility, as long as the facility can continue the person's program of treatment, provide adequate security, and minimize interference with the person's program of treatment. If the facility designated by the community program director is a county jail, the patient shall be separated from the general population of the jail. In the case of a sexually violent predator, as defined in Section 6600 of the Welfare and Institutions Code, who is held pending civil process under the sexually violent predator laws, the person may be housed as provided by [Penal Code] Section 4002. The designated facility need not be approved for 72-hour treatment and evaluation pursuant to the provisions of the Lanterman-Petris-Short Act . . . ; however, a county jail may not be designated unless the services specified above are provided, and accommodations are provided which ensure both the safety of the person and safety of the general population of the jail. Within three judicial days of the patient's confinement in a jail, the community program director shall report to the court regarding what type of treatment the patient is receiving in the facility. If there is evidence that the treatment program is not being complied with, or accommodations have not been provided which ensure both the safety of the committed person and the safety of the general population of the jail, the court shall order the person transferred to an appropriate facility, including an appropriate state hospital. Nothing in this subdivision shall be construed as authorizing jail facilities to operate as health facilities, as defined in Section 1250 of the Health and Safety Code, without complying with applicable requirements of law." (Pen. Code, § 1610, subd. (b).)

[4]Sections 5325 and 5325.1 set out the legal and civil rights of certain classes of mentally ill persons who are involuntarily or voluntarily detained in certain facilities. The trial court's June 25, 2002 order was not based on the latter provisions, and the order acknowledges that "the rights listed in Section 5325 may not necessarily apply to SVP's . . . ." As there is no

proceedings, that DMH did not have "jurisdiction" over the alleged SVP's and that DMH will not have such jurisdiction "until [the alleged SVP] is civilly committed to a State hospital following a probable cause hearing . . . ."

With its "Special Appearance," DMH also filed a "Notice . . . of Non-appearance at Hearing on the Order to Show Cause." DMH asserted that it was not appearing at the hearing because it was not a party to the commitment proceedings and the court did not have jurisdiction over either the Attorney General or the DMH.

In April and May 2002, the court held hearings over the course of three days on the motions for appropriate housing and treatment, which hearings were not attended by a representative of DMH or the Attorney General. The hearings were attended by a representative of the county counsel, appearing on behalf of the sheriff's department. County counsel stipulated that the county jail provided no treatment program for alleged SVP's.

The court received testimony about the living conditions in the county jail from several alleged SVP's who were being detained there. The alleged SVP's testified that they were housed together, but apart from the general jail population, in pod 131A of the county jail, a large dormitory with bunk beds and about 42 inmates. The alleged SVP's were classified as "K-10," or the highest level of restriction and handling. The alleged SVP's had no educational opportunities, were not allowed in the jail library, were allowed brief noncontact visits three days per week, and lived in conditions which they claimed were overcrowded and afforded no privacy, no dignity, and no humane care.

The court also received information about the circumstances of eight alleged SVP's, which included the six who had filed the motions, as well as Donald Anderson and Fred Faith, who filed joinders in the motions made by the others.

Ciancio had not had a probable cause hearing at the time of the court's June 2002 order. Ciancio was arraigned on a petition under the SVPA on July 1, 1997, and in late July 1997 he was sent to ASH, where he remained and obtained voluntary treatment under phase 1 of the Sex Offender Treatment Program (SOTP) until November 1998, when he was sent to the county jail. According to Ciancio, he was removed to the county jail as a result of the enactment of section 6602.5 in 1998. (See fn. 1, *ante.*) At ASH

cross-appeal from the order, we need not further address issues pertaining to sections 5325 and 5325.1.

Ciancio also participated in an Alcoholics Anonymous program and a Narcotics Anonymous program. Except for a three-month period of time from December 1999 to February 2000, when the county jail offered substance abuse counseling to the alleged SVP's, no SVP treatment program was offered to him in the county jail. Ciancio's probable cause hearing had been delayed because of issues regarding his reevaluation by DMH.

Blake was released from prison in May 2000 and went directly to the county jail. Because he was litigating the facial validity of his petition, he had not yet been arraigned on the petition by mid-2002. Blake was assaulted by another inmate in August 2000 and for his own protection was removed from pod 131A and placed in a single cell in unit 132, where he was confined to his cell for about 23¾ hours each day. Before Blake came to the county jail, he was taking medication prescribed by a psychiatrist but had not yet begun any treatment under the SOTP.

Salcido, Parker, Groen and Weathington all were housed at ASH and in phase 1 of the SOTP after probable cause determinations. Groen had a pretrial hearing in April 2002; Weathington had a trial date set in May 2002.

Anderson and Faith also had already had their probable cause hearings but were being housed in the county jail. Anderson had a trial date for August 2002, but no trial date had been set in Faith's case.

After the motions had been submitted, the trial court issued a 13-page order on June 25, 2002. The order stated that the court consolidated all of the motions for appropriate housing and declared "this Order to be applicable to all persons detained in the County of Los Angeles, pursuant to the [SVPA]." The order set out the court's analysis of the provisions of the SVPA and Penal Code sections 1610 and 4002 and concluded that all alleged SVP's who were awaiting trial had a statutory right to "continuous treatment."

The order provided in pertinent part: "A reading of Penal Code section 1600, in conjunction with Section 1610, reveals that where an SVP is awaiting judicial examination of his outpatient status, he should be housed according to the procedures set forth in Penal Code section 4002. Section 4002, however, does not appear to be exclusively applicable to SVPs with outpatient status. The plain language of the statute leads to the reasonable conclusion that all persons detained pursuant to the SVPA, in local custody or other facilities, are to enjoy certain privileges, in terms of administrative segregation and continuous treatment, at all stages of the involuntary civil commitment. Moreover, [Penal Code] Section 4002 refers to Section 1610, in its emphasis of continuous treatment, where possible. [¶] As a result,

while this Court agrees that Penal Code sections 1610 or 4002 do not mandate housing of SVPs at Atascadero, the logical implication is that they do require administrative segregation and continuous treatment for such persons, regardless of whether they have received their probable cause hearing and/or the location of their placement. . . . [¶] It is important to note that the focus of this Order is not necessarily the location of placement, but the guarantees of continuous treatment."

The court ordered that "to the extent possible, SVPs who have received their probable cause determination, are ordered to be transferred to Atascadero in order to receive treatment. In the alternative, they are to be provided treatment in any facility where they are currently placed, including any county jail. Similarly, those SVPs, awaiting their probable cause hearing and who are housed in a county jail, are to receive treatment. Finally, SVPs who were returned to the county jail from the State Hospital pursuant to Welfare and Institutions Code section 6602.5, and who were provided treatment at the state hospital, shall resume treatment."

The court order also contained a lengthy discussion of the underlying reasons justifying its statutory interpretation, particularly its concern that the SVPA not be transformed into a penal law. In this regard, the trial court stated that "it is the opinion of this Court that lengthy detentions under conditions similar to those of penal inmates, and especially, without treatment, defeat the legislative purpose of treating SVPs, and transform the Act into a penal law, which is wholly inconsistent with the legislative intent. Where the actual commitment following the jury trial is two years . . . , any pre-trial detention, lasting more than the two-year period, appears unreasonable if it is not accompanied by a preliminary treatment program."

On July 9, 2002, DMH, by the Attorney General, filed a document captioned "Special Appearance . . . to Make Application for Reconsideration and Revocation of this Court's June 25, 2002 Order . . . ." In points and authorities, DMH argued that it was not a party to the commitment proceedings, it did not make a general appearance in the proceedings, and thus it "did not have an opportunity to present evidence of 'unfeasibility' to provide treatment to persons housed in a facility other than ASH." DMH also argued that the court's order was contrary to law. Attached to the application for reconsideration were several declarations of employees of ASH or DMH, setting out the nature of the facilities operated by DMH and the treatment program offered SVP's at ASH. ASH's clinical administrator, Grenda Ernst, provided a declaration stating that ASH provides SVP's treatment under the SOTP, which is "a long-term effort with long-term treatment goals in a stable treatment environment" with 24-hour staffing; the

SOTP provides for medications, cognitive-behavior therapy, couples and marital therapy, substance abuse treatment, education and vocational training, and leisure and recreational activities; the SOTP is structured in five phases, from treatment readiness (phase 1 to phase 5, known as "CONREP" or a conditional release program requiring court approval and involving ongoing supervision and monitoring. The County of Los Angeles filed a joinder in the motion for reconsideration.

After an August 15, 2002 hearing on the motion for reconsideration, which hearing was attended by a deputy attorney general on behalf of DMH, the court denied the motion. ▬ ▬ On August 20, 2002, DMH, identifying itself as a real party in interest, filed a notice of appeal from the June 25, 2002 order.[5] On August 30, 2002, DMH filed a petition for writ of mandate, or in the alternative, a writ of prohibition or certiorari and requested an immediate stay of the June 25, 2002 order. On September 5, 2002, we denied the petition but issued an order expediting the appeal. (*State Department of Mental Health v. Superior Court* (Sept. 5, 2002, B161109).)

## DISCUSSION

### A. *Jurisdictional and Procedural Issues*

DMH claims the trial court lacked personal jurisdiction over it, and also claims that the trial court had no authority to entertain the motions by the alleged SVP's because the SVPA contains no provisions permitting them to challenge their conditions of confinement during the commitment proceedings.

---

[5] DMH argues that the order is appealable because it is a final determination on a collateral matter and resolves all issues between DMH and the alleged SVP defendants in the commitment proceedings below. DMH claims it is not a party to those commitment proceedings and the trial court erred in "exercising jurisdiction" over DMH. We need not resolve the jurisdictional issue in the context of the appealability issue. We conclude that the June 25, 2002 order is tantamount to an order granting injunctive relief, which is appealable under Code of Civil Procedure section 904.1, subdivision (a)(6).

"[T]he ostensible purpose of Code of Civil Procedure section 904.1, subdivision (f) [the predecessor to section 904.1, subdivision (a)(6)] [is] to provide immediate appellate review of orders granting or denying pendente lite injunctions." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 649 [4 Cal.Rptr.2d 689]; see also *Bailey v. Fosca Oil Co.* (1962) 211 Cal.App.2d 307, 309 [27 Cal.Rptr. 454] [order staying prosecution of action deemed to be appealable injunctive order].) We reject Ciancio's argument that DMH's only remedy is under Code of Civil Procedure section 418.10, dealing with motions to quash for lack of jurisdiction and affording review by extraordinary writ. Code of Civil Procedure section 418.10 is inapplicable here, as DMH made no such motion to quash below and the trial court made no such order.

We grant the request by respondents Blake, Faith and Anderson to take judicial notice of Assembly Bill No. 695, as amended on May 25, 2001, and as amended in the Senate on July 3, 2001.

DMH offers two arguments to support its claim the trial court lacked personal jurisdiction over it: (1) it was "a non-party to the SVP commitment proceeding" and (2) it "did not waive jurisdiction," apparently referring to its filing of documents which purported to constitute a "special appearance."

We conclude that DMH's response to the OSC constituted a general appearance, and its challenge to the trial court's exercise of personal jurisdiction over it lacks merit.

■ "[A]n SVPA commitment proceeding is a special proceeding of a civil nature, because it is neither an action at law nor a suit in equity, but instead is a civil commitment proceeding commenced by petition independently of a pending action." (*People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 988 [114 Cal.Rptr.2d 760].) "Accordingly, unless otherwise indicated on the face of the statute, rules of civil procedure will operate." (*People v. Superior Court (Preciado)* (2001) 87 Cal.App.4th 1122, 1128 [105 Cal.Rptr.2d 159].)

■ "A general appearance occurs where a party, either directly or through counsel, participates in an action in some manner which recognizes the authority of the court to proceed. It does not require any formal or technical act." (*Mansour v. Superior Court* (1995) 38 Cal.App.4th 1750, 1756 [46 Cal.Rptr.2d 191] (*Mansour*).) The statutory list of acts constituting an appearance, such as filing an answer, demurrer or motion to strike, is not exclusive; rather, the term may apply to various acts which, under all of the circumstances, are deemed to confer jurisdiction of the person. (*Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1147 [95 Cal.Rptr.2d 701, 998 P.2d 403].) If a defendant raises any issue other than jurisdiction or asks for any relief which can only be granted upon the hypothesis that the court has jurisdiction of his person, his appearance is general. (*Mansour, supra*, 38 Cal.App.4th at pp. 1756-1757.) The statement that the appearance is special is not necessarily conclusive. (*Slaybaugh v. Superior Court* (1977) 70 Cal.App.3d 216, 221-222 [138 Cal.Rptr. 628].) Thus, opposing a motion on other than jurisdictional grounds has been held to constitute a general appearance. (See, e.g., *366-386 Geary St., L.P. v. Superior Court* (1990) 219 Cal.App.3d 1186, 1194 [268 Cal.Rptr. 678].)

■ Applying the above principles, we conclude that DMH made a general appearance in response to the OSC, thus waiving any objection to the trial court's exercise of personal jurisdiction over it. DMH filed a response to the OSC in which it argued the merits of the motions, challenged the relief sought by the alleged SVP's, and expressly requested that the motions be denied on their merits. This constituted a general appearance,

whether or not DMH was the real party in interest or otherwise a party to the proceedings. (See *In re Marriage of Lemen* (1980) 113 Cal.App.3d 769, 779 [170 Cal.Rptr. 642] [nonparty witness who filed opposition to discovery motion objecting to jurisdiction, but also seeking other relief, made a general appearance]; *Howard v. Data Storage Associates, Inc.* (1981) 125 Cal.App.3d 689, 698-699 [178 Cal.Rptr. 269] [in action for dissolution of corporation, nonparty individual director who filed a response to motion to surcharge and who participated in hearing made a general appearance in the action].) Because the trial court properly exercised jurisdiction over DMH, we need not address the assertions raised in the appellate briefs of the alleged SVP's that DMH was a necessary or "indispensable party" or a real party in interest since it had initiated the SVP proceedings seeking the commitment of the SVP's to its custody. (See Code Civ. Proc., §§ 389, 382, 367.)

DMH also challenges the alleged SVP's use of the motion procedure as the vehicle to raise issues pertaining to their conditions of confinement, arguing that the SVPA lacks specific provisions allowing such motions to challenge the conditions of confinement during the commitment proceedings. DMH maintains that the proper vehicle for raising such issues was a civil rights action. Ciancio counters that DMH waived this point for failing to raise it below and that the trial court properly could have construed the motions to constitute habeas corpus proceedings. In its reply brief, DMH does not contest the point that a petition for writ of habeas corpus is a proper vehicle by which an alleged SVP may contest the terms and conditions of confinement. (See, e.g., *In re Lopez* (1969) 1 Cal.App.3d 683, 686 [82 Cal.Rptr. 129] [adjudicated mentally disordered sex offender who was a patient of Department of Mental Hygiene and confined under jurisdiction of Department of Corrections had right to test terms and conditions of confinement by petition for writ of habeas corpus].)

■ Assuming for purposes of argument that the labeling of the pleadings as a motion rather than as a petition for writ of habeas corpus constituted an error or procedural defect, it was waived by the failure of DMH to raise the point below. (*Wiley v. Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 187-188 [269 Cal.Rptr. 240] [appellate court will not consider procedural defects in connection with relief sought or defenses asserted where no objection was made to lower court]; see also *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].) Having made a general appearance below, and having opposed the motions on their merits, DMH is subject to the general rule that " 'one cannot avail himself of the advantage of being a party and escape the responsibilities.' " (*Creed v. Schultz* (1983) 148 Cal.App.3d 733, 740 [196 Cal.Rptr. 252].) If the motion procedure was

erroneous, DMH had an opportunity and an obligation to raise the point below, which would have afforded the moving parties notice and an opportunity to correct any purported deficiencies. Not having done so below, DMH is precluded from raising the point on appeal.

.We conclude that DMH's jurisdictional and procedural challenges are without merit.

B. *Treatment*

DMH maintains that neither Penal Code section 1610 nor section 4002, subdivision (b) applies to the alleged SVP's involved in this appeal. According to DMH, Penal Code section 1610 applies only to those SVP's who are subject to revocation of their outpatient status, and Penal Code section 4002, subdivision (b) applies only to permit an alleged SVP to waive placement in administrative segregation and allow his housing in the general population of the jail.

DMH fails to analyze the above provisions in the context of the SVPA. DMH also fails to distinguish the situations of those alleged SVP's who have had their probable cause hearings from those that have not, and those alleged SVP's that have begun treatment from those that have not begun treatment. As is explained below, those distinctions are critical, given the language of the applicable statutes. We first provide a constitutional context for the issue of precommitment treatment under the SVPA.

1. *No Precommitment Right to Mandatory Treatment*

In a case upholding the Kansas Sexually Violent Predator Act upon challenges based on due process, double jeopardy, and ex post facto grounds, the United States Supreme Court in *Kansas v. Hendricks* (1997) 521 U.S. 346 [117 S.Ct. 2072, 138 L.Ed.2d 501] (*Hendricks*) stated: "While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, [citation], we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a 'punitive' purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. [Citation.] Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions." (*Hendricks, supra,* 521 U.S. at p. 366 [117 S.Ct. at p. 2084].)

In the State of Kansas, the sexually violent predators were held in a segregated unit within the prison system. Yet "[t]he State . . . represented that an individual confined under the Act is not subject to the more restrictive conditions placed on state prisoners, but instead experiences essentially the same conditions as any involuntarily committed patient in the state mental institution." (*Hendricks, supra,* 521 U.S. at p. 363 [117 S.Ct. at p. 2082].) In *Hendricks,* none of the parties argued that involuntarily committed patients under the Kansas general civil commitment statute were subject to punitive conditions. (*Ibid.*)

The United States Supreme Court upheld Kansas's statutory scheme for commitment of sexually violent predators given that the legislation's overriding concern was the continued segregation of sexually violent offenders, with the "ancillary goal of providing treatment to those offenders, if such is possible." (*Hendricks, supra,* 521 U.S. at p. 366 [117 S.Ct. at p. 2084].)

■ The California Supreme Court in *Hubbart v. Superior Court* stated that *Hendricks* "suggests that there is no broad constitutional right of treatment for persons involuntarily confined as dangerous and mentally impaired, at least where 'no acceptable treatment exist[s]' or where they cannot be 'successfully treated for their afflictions.' To the extent Hubbart suggests the contrary is true and that the SVPA should be invalidated as a result, he is mistaken." (*Hubbart v. Superior Court, supra,* 19 Cal.4th at p. 1166.)

Although there may not be a broad constitutional right of treatment for SVP's, some states "begin treatment of an offender soon after he has been apprehended and charged with a serious sex offense." (*Hendricks, supra,* 521 U.S. at p. 388 [117 S.Ct. at p. 2095] (dis. opn. of Breyer, J.).) Accordingly, state law provisions may afford treatment for an alleged SVP prior to the time of trial and adjudication in commitment proceedings. Those provisions for treatment may be mandatory or discretionary.

We examine the California SVPA to ascertain whether treatment is either required or permitted prior to the time a person is adjudicated as an SVP. " 'The applicable principles of statutory construction are well settled. ■ "In construing statutes, we must determine and effectuate legislative intent." [Citation.] "To ascertain [legislative] intent, we look first to the words of the statutes" [citation], "giving them their usual and ordinary meaning." [Citation.]' [Citation.] ' " " ' "In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . ." ' ' [Citation.]" ' [Citation.]" (*People v. Cheek* (2001) 25 Cal.4th 894, 899 [108 Cal.Rptr.2d 181, 24 P.3d 1204].)

 The parties have not brought to our attention any statute which *mandates* treatment for alleged SVP's prior to trial. Ciancio argues that Penal Code sections 1610, subdivision (b) and 4002, subdivision (b) "Mandate Treatment of All SVPs in Local Custody." Yet Penal Code section 4002, subdivision (b), deals with administrative segregation of alleged SVP's in the county jail and states that "to the extent possible, the person shall continue in his or her course of treatment, if any." (Pen. Code, § 4002, subd. (b); fn. 2, *ante*.) The only reasonable construction of this language is that it applies to continue treatment, "to the extent possible," for those alleged SVP's who already have begun a course of treatment; Penal Code section 4002 does not purport to create any right of treatment in the first instance.

Penal Code section 1610 also contains no language mandating pretrial psychiatric treatment for alleged SVP's. Rather, section 1610 deals with those SVP's who have already been committed and are on outpatient status from that commitment. Further, the reference in subdivision (b) of section 1610 to a facility that can "continue the person's program for treatment" contemplates that the committed SVP is already participating in a program of treatment. Thus, like Penal Code section 4002, section 1610 cannot reasonably be read to *mandate* pretrial treatment of alleged SVP's.

### 2. *Discretionary Treatment Under Section 6602.5*

 We next address the issue of whether the Act or other statutory provisions permit the court to order treatment for alleged SVP's. We conclude that two statutory provisions allow the court to order treatment for alleged SVP's under certain circumstances.

For those alleged SVP's who have had a probable cause determination, section 6602.5, subdivision (a) (fn. 1, *ante*) *permits* the trial court to order them to a state hospital, which is a therapeutic environment where treatment is provided. Subdivision (a) of section 6602.5 provides in pertinent part that "[n]o person *may be placed* in a state hospital pursuant to the provisions of this article until there has been a [probable cause] determination pursuant to Section . . . 6602 . . . ." (Italics added.) The use of the word "may" indicates an intention to afford discretion to the trial court to place an alleged SVP in a state hospital after a probable cause determination. Under the provisions of section 6600.05, that state hospital is to be ASH until a permanent housing and treatment facility is available. Accordingly, by virtue of its discretion to place an alleged SVP in a state hospital after a probable cause determination, the trial court also has the discretion to order treatment.

Because placement in a state hospital is not mandatory, but discretionary, the statutory scheme contemplates that either the alleged SVP or the People may request such placement after the probable cause determination, and either party may also oppose such a request. Placement of the alleged SVP in a state hospital for treatment after a probable cause determination is thus a matter for the trial court's discretion to be exercised under the circumstances of each individual case.

Our record establishes that even before the order in issue here DMH accepted the placement of many alleged SVP's at ASH after their probable cause determinations, thus impliedly interpreting section 6602.5 in a manner consistent with our view. ■■■ We may accord great weight to an administrative agency's construction of statutes it is charged with implementing and enforcing. (*County of Santa Barbara v. Connell* (1999) 72 Cal.App.4th 175, 185 [85 Cal.Rptr.2d 43].) ■■■ We therefore construe section 6602.5 to permit alleged SVP's with a probable cause determination to be placed at ASH and to receive treatment.

A different result is not compelled by language in *People v. Hubbart*, *supra*, 88 Cal.App.4th 1202, involving equal protection challenges to various provisions of the SVPA. Without addressing the provisions of section 6602.5, the court in *People v. Hubbart* rejected Hubbart's contention that "the SVPA violates equal protection by failing to provide for treatment prior to the commencement of long-term commitment, in contrast to the MDO [(mentally disordered offender)] law and [Lanterman-Petris-Short] Act." (*People v. Hubbart, supra*, 88 Cal.App.4th at p. 1221.) For purposes of the equal protection challenge to the treatment provisions of the SVPA, the court assumed the correctness of Hubbart's characterization of the SVPA but distinguished the nature of the persons committed under the SVPA from those committed under the other acts. In rejecting an equal protection challenge to the lack of any custody credits under the SVPA, the court likewise found that SVP's were not similarly situated to MDO's. The court stated that "SVPA commitments are not necessarily related to the crime for which the offender is in prison, and the SVP determination is not made until the person's prison term is about to end or has ended. An SVP's treatment thus does not begin until the commencement of his or her commitment. In this respect, SVP's are not similarly situated to MDO's." (*People v. Hubbart, supra*, 88 Cal.App.4th at p. 1224.) Because the court in *People v. Hubbart* did not address the particular language of section 6602.5 or the issue of discretionary treatment of SVP's prior to trial, that case is not dispositive here.

The record contains the trial court proceedings for only some of the alleged SVP's who are respondents on this appeal. According to that record,

two alleged SVP's, Faith and Anderson, had probable cause determinations and were housed in the county jail awaiting trial. The trial court, pursuant to section 6602.5, properly granted the motions by Faith and Anderson requesting placement at ASH, so this aspect of the June 25, 2002 order is to be affirmed.

Groen, Parker, Salcido, and Weathington also had probable cause determinations, but they were already housed at ASH and receiving treatment. The trial court's order does not separately address the issue of treatment for those alleged SVP's who had probable cause determinations and are already receiving treatment at a state hospital or other facility but who may be housed *temporarily* in the county jail pending court appearances or trial. As to those alleged SVP's, we conclude that Penal Code section 4002 governs the situation when they may be temporarily placed in the county jail. We thus intend the following statutory analysis to apply to the issue of the provision of treatment for those alleged SVP's who have had probable cause determinations and may be temporarily housed in the county jail for court appearances or trial.

### 3. Treatment Under Section 4002, Subdivision (b)

Penal Code section 4002, subdivision (b) applies without qualification to all inmates in the county jail "who are held pending civil process under the sexually violent predator laws." The section therefore includes all alleged SVP's whether or not they have had a probable cause determination. Yet the language of the statute providing that "to the extent possible, the [alleged SVP] shall continue in his or her course of treatment, if any," requires treatment only if the person has already begun a course of treatment and only if it is possible to continue that course of treatment in the county jail. Thus, with respect to those alleged SVP's who had begun psychiatric treatment at the time they filed their motions below, we conclude that Penal Code section 4002, subdivision (b) requires the continuation of their course of treatment in the county jail "to the extent possible."

Accordingly, in order for treatment to be provided under Penal Code section 4002, subdivision (b), the trial court must find that the alleged SVP was already receiving treatment and that it was possible to continue such course of treatment in the county jail. The trial court's order contains none of these required findings because the trial court erroneously interpreted Penal Code section 4002, subdivision (b) as requiring that "all persons detained pursuant to the SVPA, in local custody or other facilities, are to enjoy certain privileges, in terms of administrative segregation and continuous treatment, at all stages of the involuntary civil commitment." As a result,

the trial court made no particularized findings that any alleged SVP was receiving treatment and that the continuation of his course of treatment was "possible" in the county jail. Because the trial court did not properly interpret or apply the provisions of Penal Code section 4002, subdivision (b), the matters are to be remanded to the trial court for further proceedings and findings under section 4002, subdivision (b).

We need not address the contention of DMH that the trial court erred in "Accepting an 'As Applied' Challenge to the [Constitutionality of the] SVPA" because the trial court did not determine that any aspect of the SVPA was unconstitutional as applied.

### DISPOSITION

That part of the June 25, 2002 order granting the motions of post-probable-cause alleged sexually violent predators for housing and treatment at Atascadero State Hospital is affirmed; in all other respects the order is reversed and the matters are remanded for further hearings pursuant to Penal Code section 4002, subdivision (b).

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

Petitions for a rehearing were denied June 27, 2003, and the opinion was modified to read as printed above. The petitions of respondents Kenneth Ciancio, Donald Anderson, William King, Barry Blake and Fred Faith for review by the Supreme Court were denied August 13, 2003.