Filed 5/6/26  P. v. Hammons CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B342068 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM019607) |
| v. | |
| BRIAN HAMMONS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Brian Hammons appeals after the trial court found he qualified as a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.)[1] and ordered his indeterminate commitment to the State Department of Mental Health.

On appeal, appellant contends the evidence was insufficient to establish that he "presently represented a serious and well-founded risk of reoffending in a sexually predatory manner." We disagree and affirm the judgment.

## BACKGROUND

### A. Qualifying Sexually Violent Offenses

In 1996, appellant was convicted of lewd acts on a child. (Pen. Code, § 288, subd. (a).) The victim was appellant's six-year-old half-brother or stepbrother.[2] Appellant touched the victim's penis three times and sodomized him twice. On one occasion, while the victim was in bed, appellant pulled down the victim's pants and put his penis inside the victim's anus.

In 1998, while still on probation for the 1996 offense, defendant was convicted of forcible lewd acts on a child (Pen. Code, § 288, subd. (b)(1)). The victim was a six-year-old boy who was riding a bicycle. Appellant enticed the victim into a garage. There, appellant told the victim, "Take your pants down or I'll rip your head off." Appellant also ordered the victim to get down on the ground. Appellant then got on top of the victim, who managed to flee by throwing keys and causing a distraction.

In August 2012, the People filed a petition to commit appellant as an SVP. (See § 6601.) A probable cause hearing was held in January 2013. (See § 6602.) Over the next 11 years, the matter was continued more than 40 times. While at the state hospital pending trial, appellant was convicted of possessing child pornography, in violation of Penal Code section 311.11.[3]

In October 2024, appellant waived his right to a jury trial and the matter proceeded to court trial.

---

[1]   All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2]   We will refer to this victim as appellant's half-brother.
[3.]   Appellant was arrested for that offense in 2020 and convicted in 2022.

2

## B. The People's Experts

The People presented two experts who opined that appellant met the requirements for commitment as an SVP.

Dr. Craig Teofilo, a licensed psychologist, had been performing SVP evaluations since 2007. He was a "master trainer" on risk assessments such as the Static-99. At the time of trial, he had performed SVP evaluations on about 500 people. About 16 percent of his first-time evaluations resulted in a finding that the person was an SVP.

Dr. Teofilo initially evaluated appellant in 2012, while appellant was still in prison. He did updated evaluations in 2012, 2017, 2019, 2020, and 2024. Appellant declined to participate in interviews for the last three evaluations.

During the 2012 evaluation, appellant was asked about the incident with his half-brother. Appellant said that "somehow," he had woken up "with his penis in his brother's anus." In 2017, appellant acknowledged two other sexual touchings of his half-brother. One involved pushing his half-brother's butt; the other occurred while they were wrestling.

Appellant also discussed the incident with the second victim during the 2012 evaluation. Appellant acknowledged that the victim was a stranger. Appellant admitted placing his hand on the victim's shoulder but denied making any threats or any attempt to molest the victim. In 2017, appellant changed his story: he admitted that he had asked to see the victim's penis, and he claimed he had been introduced to the victim two years earlier.

During both the 2012 and 2017 interviews, appellant denied looking at child pornography. Appellant did acknowledge that he had a sexual interest in six- to eight-year-old boys. Appellant admitted he had masturbated to "deviant sexual fantasies" involving boys about twice a month between 1998 and 2005, as well as about eight times within the time period of 2012-2017.

In 2017, appellant was only participating in "pretreatment groups"; he was not doing the sex offender treatment program (SOTP). Appellant was opposed to participating in the SOTP because he believed he might be subject to a polygraph test or a penial plethysmograph, which would assess his deviant sexual interest.

3

Dr. Teofilo diagnosed appellant with pedophilic disorder, which is characterized by "a persistent pattern of urges, thoughts, fantasies, behaviors involving prepubescent children," which the person has acted on when over the age of 16 and at least five years older than the victim. Pedophilic disorder can be managed and controlled, but not cured.

Dr. Teofilo opined that appellant exhibited volitional impairment. When he committed the second qualifying offense, appellant knew it was wrong, was on probation for the first offense at the time, and had told himself he "was never going to do it again," yet he reoffended. Appellant's possession of child pornography while in the state hospital was also evidence of his volitional impairment. Appellant also exhibited emotional impairment during his offenses, in that he caused the first victim to suffer pain and he caused the second victim to suffer distress.

To assess whether appellant was likely to reoffend in a sexually violent and predatory manner without custodial treatment, Dr. Teofilo administered a structured risk assessment using two instruments: the Static-99R and the Static-2002R. Appellant's age was a factor included on the instruments; he was 48 years old at the time of his SVP trial.

Dr. Teofilo assessed appellant as an eight on the Static-99R. Originally, he had assessed appellant as a six; the increase was due to appellant's subsequent conviction of possessing child pornography. An eight is within the highest risk level, representing a "well above average risk." On the Static-2002R, appellant assessed as a nine, which also fell within the "well above average" range. Appellant's scores were in the 99th and 98th percentiles, respectively. His score on the Static-99R corresponded with reoffense rates of 31 percent within five years, 40.9 percent within 10 years, and 50.3 percent within 20 years.

Dr. Teofilo also examined the dynamic risk factors present in appellant's case. Significant factors included appellant's commission of offenses while under supervision and his failure to complete sex offender treatment.

Dr. Mark Patterson, another licensed psychologist, had been doing SVP evaluations since 2008. At the time of trial, he had performed SVP

evaluations on about 900 different people.  About 20 percent of his first-time evaluations resulted in a finding that the person was an SVP.

Dr. Patterson did a "replacement evaluation" of appellant in 2024 because the previous evaluator was not available. Appellant declined to be interviewed for the evaluation.

Like Dr. Teofilo, Dr. Patterson diagnosed appellant with pedophilic disorder, scored him as an eight on the Static-99R, and scored him as a nine on the Static-2002R.  Dr. Patterson also performed a dynamic risk assessment, finding that appellant "got the highest score possible" on about half of the 17 factors.  Appellant's total score was in the 95 percentile.  The dynamic risk factors included that appellant had been able to keep his "deviant sexual interest" in young boys active by possessing child pornography, and his decision not to participate in the SOTP.

### C.    Defense Evidence

Dr. Joseph Plaud, a licensed psychologist, had conducted hundreds of evaluations as a court-appointed expert in federal court and other states.  He interviewed appellant as part of the evaluation he performed in 2024.

Dr. Plaud evaluated appellant using the SVR-20 risk instrument as well as the Static-99R.  For the Static-99R, Dr. Plaud gave appellant a six, but acknowledged, "It could have realistically been a seven."  He further acknowledged, "If you consider . . . the child pornography issue, it could even reasonably be considered an eight."  Dr. Plaud only included the five-year reoffense rate for a score of six in his report.  He did not include any 10-year or 20-year reoffense rates, calling those "dubious" and "ridiculous."

Dr. Plaud agreed with the prosecution experts that appellant had a diagnosis of pedophilic disorder.  However, he did not believe that appellant was likely to engage in sexually violent predatory criminal behavior if released from custody.  Dr. Plaud noted that appellant was 48 years old and had not manifested any risk factors in the 30 months since completing his sentence for possession of child pornography.

Lorraine Halonski, a behavior specialist at the state hospital, co-facilitated two groups that appellant participated in for about 16 months, starting in 2016.  Appellant first completed several 12-week sessions of the Sexual Compulsivity Recovery group, which is not part of the SOTP but

covers some of the same issues. Appellant participated "pretty consistently" in the group. Appellant also did one or two 12-week sessions of a group called Cycle of Abuse.

Halonski was asked her opinion of a patient who had completed her groups but had subsequently possessed child pornography. She opined, "That would indicate to me that the patient needed to develop more skills to manage . . . their sexually deviant thinking and their sexually deviant acting out on that thinking."

Elifeo Garcia, another behavior specialist at the state hospital, also facilitated two courses that appellant attended from 2013 to 2014. First, appellant regularly attended Values in Action and was an "active participant." Next, appellant attended Self-Regulation, Problem Solving, and Positive Decision-Making. He demonstrated progress in that group. Both groups appellant attended are required for patients in the SOTP.

### D.    Trial Court Findings

In finding that appellant met the SVP criteria, the trial court explained that it had problems with Dr. Plaud's credibility and found him "somewhat biased." The trial court found it significant that appellant had not engaged in the SOTP but had demonstrated and admitted a "multi-decade desire for sexual relations with prepubescent boys."

## DISCUSSION

Appellant contends that there was insufficient evidence to establish beyond a reasonable doubt that he was an SVP. He specifically argues there was insufficient evidence that he "presently represented a serious and well-founded risk of reoffending in a sexually predatory manner."

### A.    Legal Principles

An SVP is "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) Under the SVPA, the People may seek to confine and treat SVPs "until their dangerous disorders recede and they no longer pose a societal threat." (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 815.)

6

To commit a defendant as an SVP, the People must prove four conditions: (1) the person has previously been convicted of at least one qualifying "sexually violent offense" listed in section 6600, subdivision (b) (§ 6600, subd. (a)(1)); (2) the person has "a diagnosed mental disorder that makes the person a danger to the health and safety of others" (*ibid.*); "(3) the mental disorder makes it likely the person will engage in future acts of sexually violent criminal behavior if released from custody (*ibid.*); and (4) those acts will be predatory in nature [citation]." (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190.)

A person is likely to engage in sexually violent criminal behavior if, "because of the person's diagnosed mental disorder, he or she currently presents a *substantial* danger—that is, a *serious and well-founded risk*—of criminal sexual violence. . . ." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 895.) Evidence of sexually violent behavior occurring while the offender is in custody is not required. (§ 6600, subd. (d); *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1090.)

As with any challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the SVP finding. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) "[T]his court may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.) In particular, we do not reassess the credibility of experts or reweigh the relative strength of their conclusions. (*Ibid*.) "Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment].""" (*People v. Orey* (2021) 63 Cal.App.5th 529, 561.)

"A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment." (*People* v. *Williams* (2015) 242 Cal.App.4th 861, 872.) But " 'expert medical opinion evidence that is based upon a " 'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.""" (*People v. Redus* (2020) 54 Cal.App.5th 998, 1011.)

7

**B.     Analysis**

Appellant argues that the People's experts improperly relied primarily on his diagnosis and the evidence of his predicate crimes, rather than focusing on his "current mental status and behavior."  We disagree.

First of all, evidence of appellant's past sexual offenses is highly probative of whether he is "likely to engage in sexually violent behavior if released."  (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1234.)  And here, the prosecution experts based their assessment of appellant's likelihood of recidivism not just on the crimes themselves, but the fact that appellant committed the second offense while on probation for the first offense, demonstrating his inability to control his impulses or to learn from past conduct.  The People's experts also based their risk assessments on evidence that appellant continued to have, and act on, his sexual attraction to prepubescent males.  That evidence included appellant's 2022 conviction for possession of child pornography, which occurred while he was in the state hospital, and his admission of continuing sexual attraction to prepubescent males as recently as 2017.

We also find it critical that the experts used structured risk assessment tools, including the Static-99R and Static 2002-R, which resulted in scores placing appellant in the "well above average" category for reoffending.  These tools have been shown to reasonably predict a person's risk of violence and are "more reliable than unstructured clinical judgment."  (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 158 (*Jenkins*) (conc. opn. of Buchanan, J.).)  The results of these structured risk assessments, accompanied by thorough expert testimony regarding how the scores informed their opinions, provided strong evidence that appellant posed a substantial risk of sexual violence if released.

Finally, it is significant that appellant failed to participate in the SOTP during his many years at the state hospital.  While alone insufficient to establish a substantial risk, it was properly considered by the prosecution experts as a factor strongly weighing in favor of their conclusion that appellant met the criteria for an SVP.  "A patient's refusal to cooperate in any phase of treatment may . . . support a finding that he 'is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community.'"  (*People v. Sumahit* (2005) 128

Cal.App.4th 347, 354-355.) Appellant's brief participation in two groups and general good behavior at the state hospital does not detract from the import of his refusal to participate in the treatment program that was specifically geared toward helping lower his risk of sexual reoffense.

Appellant argues his case is similar to several recent cases in which appellate courts reversed Mentally Disordered Offender commitment orders[4] after concluding the dangerousness finding was based solely on violence occurring decades earlier, *People v. Johnson* (2020) 55 Cal.App.5th 96 (*Johnson*), *People v. Cheatham* (2022) 82 Cal.App.5th 782 (*Cheatham*), and *Jenkins, supra,* 95 Cal.App.5th 142. Appellant's reliance on these cases is misplaced.

In *Johnson*, the appellate court found substantial evidence did not support the trial court's conclusion that Johnson, who was 69 years old and diagnosed with schizophrenia that was partially in remission, represented a substantial risk of harm to others. (*Johnson, supra*, 55 Cal.App.5th at pp. 108-109.) The court found the record was devoid of evidence that Johnson's decompensation in an unsupervised setting would lead to violence. To the contrary, the evidence showed that Johnson had spent 11 years in the community under conditional release, and had stopped taking his medication for several months, with "no evidence of a single violent—or even aggressive—incident" despite an increase in his symptoms of schizophrenia. (*Id*. at p. 109.)

In *Cheatham*, the charges that led to the commitment involved Cheatham's escape from criminal custody after he heard voices that led him to believe the police planned to shoot him. (*Cheatham*, *supra*, 82 Cal.App.5th at p. 786.) Cheatham was eventually placed on supervised release, but then returned to a state hospital commitment four years later, after "a number of rule violations." (*Ibid*.) He was diagnosed with schizoaffective disorder and a separate substance use disorder and began taking a medication in the hospital that largely stabilized his symptoms. (*Ibid*.) At trial, the prosecution presented testimony from two psychologists who acknowledged

---

[4]     Commitment of a mentally disordered offender requires a finding the person poses "a substantial danger of physical harm to others" because of his or her mental disorder. (Pen. Code §§ 1026.5, subd. (b)(1), 2972, subd. (c).)

that they had never seen Cheatham hurt or threaten anyone.  The record was devoid of any evidence that Cheatham had ever engaged in behavior dangerous to others because of his mental disorder, even during a period of supervised release.  (*Id*. at p. 790.)  Thus, the appellate court found that the experts' speculation that he might be unable to control such dangerous behavior in the future was not supported by substantial evidence.  (*Id*. at pp. 790-791.)

In *Jenkins*, the defendant was convicted of attacking her landlord with a hammer, fracturing his skull, and imprisoning him on her apartment floor for six hours.  (*Jenkins, supra*, 95 Cal.App.5th at pp. 145-146.)  She was subsequently transferred from prison to a state hospital for treatment and diagnosed with schizoaffective disorder (bipolar type).  (*Id*. at p. 146.)  The trial court granted a petition to extend her commitment as a mentally disordered offender, finding that Jenkins represented a substantial danger of physical harm to others because of her severe mental disorder.  (*Id*. at p. 149.)  The appellate court reversed, finding no evidence in the record that Jenkins had ever been violent or dangerous other than her commitment offense 23 years earlier.  (*Id*. at p. 153.)  The court also noted that the People's experts failed to address Jenkins' age or declining health, even though at the time of the hearing she was almost 70 years old, her health was "'starting to go downhill,'" and she had recently begun using a wheelchair due to decreased mobility.  (*Id*. at p. 153.)  On those facts, the court found that the experts' belief that Jenkins should not be released because of her lack of insight as to her mental illness and the violence of her offense of conviction was insufficient and their opinion that she posed a continued risk of violence was conclusory speculation.  (*Id*. at pp. 155-156.)

Unlike these cases, appellant was not physically limited in his ability to potentially commit further sexual offense, nor had he demonstrated that he could function on release without incident.  Moreover, none of the trial courts in those cases relied upon the professional judgment of a qualified expert who applied a structured risk assessment instrument.  (See *Jenkins, supra*, 95 Cal.App.5th at pp. 155–156; *Cheatham, supra*, 82 Cal.App.5th at p. 794; *Johnson, supra*, 55 Cal.App.5th at p. 109.)  As such, the appellate courts'

rejection of expert opinions based only on past crimes or on speculative assertions of future risk is inapplicable here.

We conclude that the evidence was sufficient to support the conclusion that appellant met the statutory criteria of an SVP.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COGLIATI, J.*

We concur:

ZUKIN, P. J.

TAMZARIAN, J.

---

* Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.